## HAMILTON *v.* THE STATE.

No. 7227.   DECEMBER 17, 1929.

*A. G. Liles, O. A. Nix,* and *I. L. Oakes,* for plaintiff in error.

*George M. Napier, attorney-general, Clifford Pratt, solicitor-general, T. R. Gress, assistant attorney-general,* and *John I. Kelley,* contra.

RUSSELL, C. J. (After stating the foregoing facts.) We will

deal first with the errors assigned in the special grounds to the motion for a new trial; for if one charged with crime is deprived of any right by the failure of the court, or if upon his trial he is not allowed every right and privilege accorded by law, in my opinion he would be entitled to a new trial, no matter how strong might be the evidence of his guilt. The great State of Georgia guarantees the enforcement of her laws, as much, though, for the protection of citizens charged with crime (and who are presumed to be innocent until lawfully convicted) as for the protection of the law-abiding citizenry and the honor of the Commonwealth. Especially is the foregoing statement true in a capital case where the jury may of its own motion, without any reason whatever, change the penalty of death to that of imprisonment for life in the penetentiary. We have carefully considered all of these assigned errors of law, and have reached the conclusion that no one of them requires the grant of a new trial.

■ Miss Blonnie Hope, a professional nurse in the hospital to which the decedent was sent very shortly after being shot by the accused, was permitted to repeat a statement of the decedent, that "he liked to have shot me again." It is now strongly argued by able counsel for the accused that no foundation was laid for the admission of this statement; and the counsel for the State take the position, which is supported by numerous decisions of this court, that the foundation, to wit, that the declarant was in a dying condition and that he was conscious of his approaching death, can be inferred from the condition of the declarant himself and his knowledge from that condition, including the realization of approaching death. It would seem from the nature of the wound and the comparatively short time which elapsed between this declaration and the time when death supervened in this instance that it might well have been left to the jury to determine from the circumstances, as frequently must be done in cases where direct proof of a statement on the part of a declarant himself is not available, that the declarant spoke in the very shadow of death and was conscious of that fact. But that question is not raised for decision in the present instance. It is true that it is argued in the assignment of error. However, no court of review can adjudicate a question which was not properly and timely presented to the trial judge. A court of review is to correct errors of the lower court, and the

judge in the lower court can not err as to a matter which he is not called upon to adjudicate. The only objection presented to the judge below, as appears from the motion for new trial, was in these words: "I think the statement, what he said, couldn't be admissible when he didn't say anything about who shot him." There is nothing in that to suggest to the court that counsel for the accused was objecting to the evidence upon the ground that it was being considered as a dying declaration, or for the particular reason that a proper foundation for the admission of a dying declaration had not been laid. It is true that the words "what he said couldn't be admissible" might afford a hint that counsel was suggesting that the evidence was hearsay, but as there is much hearsay other than proof of dying declarations (which is hearsay and is admissible even though hearsay, and properly should be objected to upon some more specific ground), the phrase quoted would not in any case be sufficient to be construed as an objection based upon the ground that the evidence was objected to because the foundation required before statements made by one in the article of death will be received had not been laid. Especially is this true when the words "what he said couldn't be admissible" were restricted by the words, "when he didn't say anything about who shot him." The words, "when he didn't say anything about who shot him," being the only last and definite reason stated, we can not say that the court erred in taking that to be the only real objection urged. On the contrary, we construe that as the reasonable and very natural construction of the objection offered in the language quoted.

We come to inquire then whether the court erred in allowing Miss Hope to testify that the deceased said, "He liked to have shot me again," after she had already testified that the declarant "didn't mention this man's name at all." Was it essential that the declarant should have called the name of the man who shot him? We do not think this was essential. Suppose, after all formal proof necessary to lay the foundation necessary to receive the dying declaration, the evidence showed that the deceased did not know the name of his assailant and died without ever having learned it. Would it be argued, if the assailant was known and his identity established by other testimony, that the dying statement of the deceased should be rejected because he himself did not know the name of his slayer? To ask the question is to answer it. In this case the patient was in

a hospital suffering from a pistol shot which had penetrated his liver, his gall bladder, and his intestines, passing (except for the skin on his back) entirely through his body, and at least five witnesses had testified as to who the man was who shot him. Therefore when the declarant said, "He liked to have shot me again." the statement could only refer to the man who shot him once, and he was as well identified by the statement as if he had called him by name. Therefore the objection, that "he didn't say anything about who shot him," to Miss Hope, is without merit. It certainly could not have worked injury to the defendant in this case, in view of the fact that the testimony was without dispute, and corroborated by the statement of the accused himself, that he shot the decedent and was the only person on the scene who showed a pistol or shot one. Furthermore, there was evidence from other witnesses who did not see the shooting, but to whom the decedent stated after he was shot that the accused shot him, and to whom he called for help upon the ground that he could hold the defendant no longer, when, according to testimony, the decedent, immediately after the pistol fired, ran to the accused and, seizing the pistol of the latter, held it with both hands until bystanders seized the accused and took him from the scene.

■ The instance or illustration given by the court at the conclusion of the definition of express malice, contained in section 61 of the Penal Code, is not subject to the objection urged against it. In the first place, the evidence does not make this a case of waylaying. All the testimony shows an absence of any previous ill will, grudge, or cause of quarrel between these men. From the nature of the quarrel it can not be conceived that the accused armed himself for the purpose of killing Riley. All the evidence shows merely a sudden quarrel over a few words. As pointed out in *Wilson* v. *State, 33 Ga.* 207 (3), 218, "Where, in charging the jury, the court correctly states the law governing the case, but exception is taken to an illustration used by the court explanatory of a legal principle, this court will not narrowly scrutinize the illustration if satisfied that, whether right or wrong, it was not calculated to mislead, and did not in fact mislead the jury." In *Roberts* v. *State, 3 Ga.* 310, 325, the same illustration complained of here was stated as one of the external circumstances indicating malice. In *Mitchum* v. *State,* 11 *Ga.* 615, 628, this court held that "previous threats,

ancient grudges, and waylaying are evidence of the external circumstances usually referred to, to illustrate a case of express malice." See *Henderson* v. *State,* 120 *Ga.* 504 (48 S. E. 167); *Johnson* v. *State,* 139 *Ga.* 92 (76 S. E. 859). So we are of the opinion that this exception is without merit.

■ After referring to, without repeating, the reasons set out in ground 6 of the motion, and insisting that the charge was erroneous for the reasons therein stated, counsel in their brief say: "If this charge of the court, without explaining to the jury in what way to apply it, did not destroy our defense, we do not understand how it might be done. Time and time again this court has held that it is reversible error for the court to confuse these sections of the code applicable to these defenses, and has pointed out to the trial judges that they should differentiate them. This was not done in this case, as will appear from the entire charge. We submit, therefore, to have given the charge complained of, without stating to the jury in what way to apply it, was confusing to them, and had the effect of destroying our defenses as aforesaid. A charge on voluntary manslaughter which commingles the law of self-defense under Penal Code section 73, and the defense of person under Penal Code sections 70 and 71, is erroneous." The cases of *Mills* v. *State,* 133 *Ga.* 155 (2) (65 S. E. 368), *Teasley* v. *State,* 104 *Ga.* 738 (30 S. E. 938), *Warrick* v. *State,* 125 *Ga.* 133 (53 S. E. 1027), *Pryer* v. *State,* 128 *Ga.* 28 (57 S. E. 93), *McCray* v. *State,* 134 *Ga.* 416 (68 S. E. 62, 20 Ann. Cas. 101), *Franklin* v. *State,* 146 *Ga.* 40 (90 S. E. 480), and *Brown* v. *State,* 168 *Ga.* 282 (147 S. E. 519) cited by counsel for plaintiff in error, are not in point in this case, because we are of the opinion, after a review of the charge as a whole, that the two defenses were so distinctly and independently given that the jury knew what this court desires they shall know,—that the law of voluntary manslaughter and the exceptions therein which will not permit the reducing of the homicide from murder to manslaughter have no reference to the defense of justifiable homicide in a case where the accused is pleading justification and not mitigation upon an indictment for murder, and is not contending that he should not be convicted of any greater offense than voluntary manslaughter but rather is demanding that he should be acquitted. It is true that the defendant in this case insisted, as contended by his counsel, that he was acting under the fears of a reasonable man that

his life was about to be taken or a felony about to be committed upon him, and that he shot influenced alone by such fears as would lawfully justify the killing, and not in a spirit of revenge. For that reason the plaintiff in error might perhaps have taken exception to any charge at all upon the subject of voluntary manslaughter.

Speaking for myself only, it is my experience as a practitioner that where a man has a case which might justify a jury under the law in acquitting him upon the ground of the fears of a reasonable man, a charge upon the law of voluntary manslaughter is frequently harmful. The jury may take the view (if the defendant is himself in doubt as to whether he was justified by the alleged fears) that the rule which should be applied would be that declaring that if the jury is in doubt as to whether the accused is guilty of murder or some lower degree of homicide, they will find him guilty of the lesser offense, and thus, as if on his own suggestion, find the accused guilty of the offense of voluntary manslaughter. But the plaintiff in error does not complain that the court erred in charging upon the subject of voluntary manslaughter. He merely criticises the form in which the instruction upon that grade of homicide was presented to the jury. We can not hold in this case that if voluntary manslaughter was applicable in the case it was error to charge the definition of the offense in the precise language of the Code. If the court had so charged the language of which complaint is made that the jury might be of the opinion that the provision of section 65 had any reference whatever to the doctrine of self-defense as predicated upon the fears of a reasonable man, the assignment of error would be meritorious. But an examination of the charge shows that while the court did not differentiate the effect of words, threats, menaces, etc., in accordance with the principles announced in *Cumming* v. *State*, 99 *Ga.* 662 (27 S. E. 177), in express terms (and he was not requested to do so), no inference was suggested to the jury that the words or threats or menaces, anything that might put a reasonably cool and courageous man in fear that a felony was about to be committed upon him or his life endangered, would prevent him from protecting himself with whatever force was necessary. The charge as to reasonable fears was so clear and favorable to the defendant that we do not think the jury could possibly have been confused or the rights of the defendant restricted when the judge charged that as to voluntary manslaugh-

ter, which is a killing in the sudden heat of passion, without malice, it could nevertheless not be justifiable, and that the defendant would be guilty of voluntary manslaughter only where an assault or something equivalent to an assault had been or was being committed upon the slayer.

■ It is urged that the error complained of in the seventh ground of the motion was peculiarly prejudicial, for the reason that "this was a case in which there was much feeling and excitement. Passion and prejudice were in the land. Although the State's witnesses made out a complete defense for the defendant, yet it was necessary to have a victim and convict. A repetition by the court of this part of the charge going to the very vitals of the case was obliged to have impressed the jury that they had the right to convict regardless." The brief of counsel then proceeds to say that "this sort of feeling should not have pervaded the jury-room. Nothing should have been done or said, especially by the court, that would have in any way caused an injustice to be done, however innocently and unthoughtedly." Of course this court can decide no question that is not presented by the record, and therefore can not know or adjudicate the alleged facts stated in the brief. The assignment of error appears in the statement of facts, and it is to the merit of the complaint embodied in this ground of the motion to which we are confined. Viewing the charge as a whole, in the language of which the law was presented as favorably to the accused as he had a right to expect, we can not say that the jury would have been authorized to infer that the court had a bias or leaning either way, or that the mere repetition of a fair and dispassionate statement of the law upon the subject resulted in any injury to the accused. As remarked by Judge Bleckley in *Brown* v. *Matthews,* 79 *Ga.* 1 (4 S. E. 13), "A charge torn to pieces and scattered in disjointed fragments may seem objectionable, although when put together and considered as a whole it may be perfectly sound. . . United they stand, divided they fall."

Able counsel have very strenuously argued that the State's witnesses made out a complete defense for the defendant. Without stating the evidence, which we have very carefully studied, we are unable to concur in the opinion of counsel. The jury was authorized to find from the testimony of different witnesses, who, so far as disclosed by the record, had no interest in the case, that the accused

was drinking, and, in response to a trivial remark by the decedent which bystanders understood to be said in jest, began to curse the decedent, and with his knife in his hand said he would pick his skull full of holes; then stated that he was nothing but a liar. The decedent told him he wanted no trouble, and more than once stated to him that he perhaps should not have made the remark, and that he was as good a friend as he had in the town. The defendant then charged the slain man with attempting to draw a weapon, when the decedent told him he had no weapon and showed his pockets from which bystanders saw, as the defendant could have seen, that he had no weapon; the accused then accused him of being a liar; the deceased then took off his spectacles and again told the defendant he was one of the best friends he had, but that a man could get enough of a thing. When the defendant saw he was unarmed, he applied to him an epithet which will be borne by no brave man and which may be legally held to be the equivalent of the first blow; whereupon the deceased either struck or slapped the defendant, who stumbled or fell to the ground and immediately drew his pistol and shot the deceased, who had not moved toward him until then, when he ran as rapidly as possible towards him and seized the pistol with both hands and called for help, stating he was shot and could hold the gun no longer, and bystanders then carried the defendant away. While the bystanders were interested in the decedent the accused got away first to his home, which he left, and the officers could not find him there because he had left at once, and concealed himself until he was arrested, pistol in hand, under the house in the city of Buford. The jury was authorized to find, from the circumstances preceding the blow struck by the decedent, that the defendant had insisted upon provoking the entire transaction which resulted in the death of the man whom he could not provoke to fight except by the use of language which authorized the blow from the fist of the decedent.

*Judgment affirmed. All the Justices concur.*