1. The judge's charge to the jury on the subject of confessions was authorized by the evidence.
(a) The Code, § 38-411, declares: "To make a confession admissible in evidence, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit or remotest fear of injury." In elaboration of this section, the court charged the jury as follows: "In order, however, for the hope of benefit or fear of injury, if any, to render a confession, if any, inadmissible, such hope of benefit or fear of injury must be induced by another. If you find there was hope or fear, yet if you find the hope or fear originated in the party's own mind from seeds of his own planting without being induced by another, and under the influence of hope or fear thus originated, the defendant made a confession, this will not exclude the confession, if any, as evidence. The hope or fear that excludes is that, and that only, which some other person kindles or excites." Held, that this charge was not erroneous as being unauthorized by the evidence; nor was it subject to criticism as being confusing and misleading.
2. The charge to the jury on the subject of drunkenness was authorized by the evidence, and was not otherwise erroneous for any reason urged.
3. The following charge, "Preparation for the act of killing, lying in wait, previous difficulties, old grudges, threats to kill, and matters of that character may be some of the evidence tending to show express malice," *Page 109 
was not subject to any of the following criticisms: (a) That it was not authorized by the evidence or the defendant's statement; (b) that it contained an expression of opinion by the court as to what had been proved; (c) that it was misleading and confusing and prejudicial to the defendant, because his only defense was insanity, which excludes all idea of malice.
4. The charge, "An abandoned and malignant heart, in the sense of the law, is commonly held to be evidence by a weapon or other appliance likely to produce death, and by the brutal and bloodthirsty use of such instrumentality," did not tend to deprive the defendant of his defense of insanity, as insisted, and was not otherwise erroneous for any reason urged.
5. The judge did not err in failing to instruct the jury on voluntary manslaughter, there being nothing in the evidence that would have authorized a charge on the subject.
6. The court did not err in refusing to admit in evidence a document offered by the defendant in claimed support of his defense of insanity, purporting to be a certified copy of "report of physical examination" contained in files of a county selective service or draft board, and stating that the defendant was disqualified for military service because of "simple adult mal. adjustment." While the certificate as to the genuineness of such document was signed by a person describing herself as clerk of such board, yet, as there was no proof whatever as to the incumbency of the particular person in such position, or as to the genuineness of the signature, the document was not so authenticated as to be admissible.
7. The evidence authorized the verdict, and the court did not err in refusing a new trial.
 No. 15442. JUNE 7, 1946. REHEARING DENIED JULY 16, 1946.
Luke Edmonds was indicted for the offense of murder, in the alleged killing of his wife, by shooting her with a certain rifle and "rifle gun." and was convicted of the offense charged, without a recommendation. His motion for a new trial as amended was overruled, and he excepted.
The killing occurred at the home of the defendant in Dougherty County, on a Sunday afternoon, in August, 1945. The only eyewitness was Jimmie Edmonds, the eight-year-old son of the accused and the deceased. This witness testified:
"I was eight years old on January 27. I go to the Leary school and make good marks. . . I did live on the Reynolds Brothers place, but I am staying with my granddaddy, Jamie Maples, now. He is here. My father's name is Luke Edmonds and my mother's name was Laura Ineeda Edmonds. I go to Sunday School and *Page 110 
church and I know what it means to do right or wrong. I know what would happen to me if I told a story, I would go to the mean man. When I held up my hand to be sworn it meant I was going to tell the truth, that is what I expect to tell these gentlemen. On the 26th day of August, the day my mother was shot, I was on the door steps. My mother was in a rocking chair. My mother and father had been having a conversation with each other that morning. My mother asked my father to go to the store, at Pretoria. My father was sober when he left home. My mother told him not to drink any, and he went on down there and when he come back he brought a half pint of white whisky. I saw him get it out from under the door steps. He drank a little and poured the rest out. My mother told him not to drink it, but he drank it anyway. I saw this rifle there that day. While my father was gone to the store, I think my mother hid it, but I don't know. Somebody hid it. My father got the rifle when he got back from the store. He got it from out there side of the hog pen. I reckon mother put it out there while my father was gone. I saw my father go to the hog pen and get the rifle when he told her he was going to kill her. Before that he had been twisting her arm. She was asking him not to twist her arm. She told me to get the brush and hit him and I got the brush and hit him. He did not quit twisting her arm and I hit him another gain and he quit. After he turned her aloose, he went and sat down in one of the chairs in the house. My mother went out on the porch, she had the baby in her lap. . . Q. Did your father take any more liquor after he shot her? A. He did. Q. How many drinks did you see him take after he came from the store and before he shot your mother? A. None. My mother was sitting on the porch with the little baby in her arms. My father came out on the porch. He did not have the rifle the first time. He went and got it after she started fussing at him. . . Q. Jimmie, had your mother asked you to go off anywhere to see if you could get anybody to come there that morning for any purpose? A. No, sir. Q. Had your mother said anything about you going to your grandfather's while they were fussing? A. Yes, sir, she told me to go and get Mr. Wilkes to go and get granddaddy. That was after my father had twisted her arm. Q. How long was it after your father twisted your mother's arm before your father shot her? A. About three minutes. *Page 111 
After I got started to get Mr. Wilkes to get my grandfather, my father said if I didn't come back he would shoot me. I turned around and came back when he told me that. . . The last thing my mother said to my father before he shot her she called him an ugly name. The last thing he said to her before he shot her was that if she didn't hush up he would shoot her. Q. Did she hush? A. Yes, sir. Q. Before he shot her? A. Yes, sir. My mother was not looking toward my father when he shot her, she was looking toward that house over there. I saw my father raise the gun and shoot my mother. He shot her two times. When he first shot her she grunted a little bit and fell over on the chair. She fell just like this (indicating). When I saw she had been shot I went and took the baby out of her lap. Q. What did your father then do? A. He shot her again. The last time he shot her he was standing up right at her. He put the gun about six inches from her head and shot. Q. What did your father do after that, after he shot your mother the second time? A. He told me to go get Mr. Wilkes to get the sheriff. I had put the little baby in the room on the floor. After my father shot her he took her under the arms and drug her in and put her on the bed. After he shot her he told me to keep her ring, he had the ring on his finger. . . After he laid her on the bed, my father said she had gone to heaven. . . I didn't see my father drink any liquor at all until after my mother was shot."
D.C. Campbell, sheriff, and Gordon Stokes, deputy sheriff, who arrested the defendant, testified that a telephone call was received on the afternoon of the killing, and they went to the home of the defendant. The sheriff testified: "I asked him what was the trouble and he said, `I killed my wife.' He said he killed her with a rifle and that this was the one. . . His appearance on the date of the shooting was that he was under the influence of intoxicating liquors. When I got there he could talk intelligently. The first statement he made was that she shot herself and then he shot her. His statement was that she shot herself the first wound and then he shot the next one to get her out of her misery. Q. Why did he change his statement? A. I don't know. He changed his statement the next morning in jail. He did not approach me about making a statement. We approached him and he said he shot her both times himself. Q. I show you what purports to be *Page 112 
a signed statement, witnessed by you, and ask you if that statement was freely and voluntarily made by the defendant? A. Yes, sir. The circumstances under which that statement was made was that we just asked him if he wanted to make any statement and he said, `Well, yes,' and he sat down there and told us just how it happened. When that statement was made he was sober, which was the next day after the killing. There was no force or threats exercised by either the deputy sheriff or me to obtain the statement from the defendant. It was freely and voluntarily made without any hope of reward or fear of punishment being held out to him. We took a statement from Jimmie the same day we took one from Luke. . . This was a voluntary statement little Jimmie made concerning the tragedy. . . Q. How many different statements did Mr. Edmonds make with reference to this transaction? A. Just two. Well, he didn't exactly make a statement, but coming on to town he made it a little different to that. He said, at that time, that she shot herself first and then he shot her. He said, before that, when we were going to town that she confessed going with another man. . . The next morning I asked him if he remembered what he told me the day before and he said he did. He then said what he had told me the day before about his wife there was nothing to it. I could not say whether Mr. Edmonds had drunk any liquor before the shooting."
Gordon Stokes, the deputy sheriff, testified: "I went with Sheriff Campbell to the scene of the homicide. . . I examined the body of Mrs. Edmonds and found two small caliber bullet holes, one in the left temple maybe an inch above the ear, and the other was in the center of the forehead. . . In my opinion a person shot in either of the places indicated within a reasonable range by a 22 rifle would produce death. Q. I show you a rifle, tell us the history of that rifle? A. When I arrived at the scene of the killing Mr. Campbell asked Mr. Edmonds where the rifle was, and he pointed behind the door, meaning the front door of the house coming into the bedroom where Mrs. Edmonds was lying on the bed. The defendant stated that that was the weapon he used to kill her with. . . Q. Did the defendant make any statement to you and the sheriff as to the reason of the killing when you got there? A. We put him in the car and started back to town with him and we asked him why he killed his wife, and he said she shot herself the first *Page 113 
time and he shot her the second time, and the question was asked why, and he said because she admitted going with another man. That was the statement he made going back from the scene. He was under the influence of some intoxicating beverage. He did not make a statement that evening as to his having drunk anything, but you could smell it. Q. Did he talk rational? A. He talked more or less like a drunk man. I talked to him about 10 o'clock the next morning. He stated at that time that he had killed his wife, that he shot her both times with a 22 rifle. He said she had been fussing with him about drinking and he shot her because he lost his head and because he was drinking at the time. He said the statement he made with reference to her going with another man was a mistake, that she didn't say she was going with another man. This paper is the statement made by Mr. Edmonds, on the morning after the killing. He gave it freely and voluntarily, without any hope of reward or fear of punishment. He read it before he signed it and said it was true. I took a statement from Jimmie, the little boy. Mr. Maples [father of the deceased] brought Jimmie into the office on Monday, at Mr. Campbell's request, this was Monday following the killing on Sunday, and this little boy was taken into Mrs. Stanley's office . . and he sat on a stool next to Mrs. Stanley and I sat by the desk; I would ask the questions, he would answer, and she wrote them down just as they were asked and answered."
The material part of the statement signed by the defendant, as testified by the sheriff and deputy sheriff, was as follows:
"Yesterday morning when I got up, Mr. Wilkes and I went over in front of my house to try to kill a wild hog. We did not find any. I came back home and kept the twenty-two (22) rifle we had while we were hunting the wild hogs. After I got back home, ate breakfast, and milked the cow, I stayed around the house for awhile, then my wife asked me to get some sugar at Mr. Hay's store in Pretoria. I went to the store and got some sugar, and while I was there I drank some wine. I left the store and on my way back home I went by a negro house. I asked him if he had anything to drink, and he said, `Yes.' I bought a half pint of shine whisky. I drank some out of the bottle. In fact, I drank about half of the bottle. I went on home and my wife began to argue with me because I was drinking. She kept on arguing with me and I told her *Page 114 
to shut up. She told me no one could make her hush. I got up off the front porch and went into the house. She stayed out there and kept on fussing. While I was in there I took another drink of whisky. I had put the rifle behind the baby bed when I brought it in earlier. I picked it up and went back out on the porch where my wife was. She was still fussing. I do not know why I carried the rifle back out there with me. I went out and sat down on the north side of the porch. The next thing I knew I was putting her to bed. Then I realized I had shot her and she was dead. Then I saw I had shot her twice. I can not say in which place I first shot her. When I came to my senses I saw she was shot on the left side of the head and in the forehead. The only reason I can give for killing my wife is that I was drunk and lost my head because she was arguing with me. I then told my little boy, Jimmie, to go to Mr. Wilkes' house and tell Mr. Wilkes to call the sheriff. I have read this statement and am signing it of my own free will. It is as near the truth as I can tell it."
The statement of the child Jimmie as made to the sheriff and deputy sheriff the day after the killing was introduced in evidence, but this is not here set out, as it contains nothing that does not appear in his testimony delivered on the trial.
It appeared that, on the day of the killing, the defendant and Buster and Raiford Wilkes went wild-hog hunting in the morning. Buster Wilkes, introduced as a witness for the defendant, testified: "I worked with Mr. Edmonds during the week prior to the time Mrs. Edmonds was killed. . . He complained considerably, during the week, about his head and borrowed money from my son to get some medicine. . . On this particular Sunday morning Mr. Luke Edmonds come up to the house pretty soon and him and my boy went wild-hog hunting. I went with them. He came there about sun up and we went around to what we called the corn patch . . and we turned around and went on back to the house. The rifle belonged to the company. We borrowed it. I don't know who borrowed it. . . We came out of the field, that morning, near Mr. Edmonds' house and he got out and carried the rifle with him. I next saw Mr. Edmonds around 9 or 10 o'clock that morning, down at the store. I did not see anybody drink anything that morning. We went on back home from the store in Hope Harris' car, and put Mr. Edmonds out at his house. I again saw Mr. Edmonds that *Page 115 
afternoon. I don't know what time it was, but a fellow had a puncture down the road and they went back to help him fix his tire and they took it up to the shop, at Mr. James Jackson's, to fix it. Mr. Edmonds was down there standing where they were fixing the tire. During all the time I saw Mr. Edmonds, if he had been drinking I could not tell it. I could not smell it while riding in the truck with him. . . I never did see him when he was drinking. I do not know whether Mr. Edmonds knew it was wrong to shoot his wife. I thought he was normal like all the rest of us, he appeared to be perfectly normal."
Mrs. Raiford Wilkes testified: "On the Sunday before Mrs. Edmonds was killed, I got in the truck here in Albany with my husband, Mr. Edmonds and Mrs. Edmonds. Mrs. Edmonds tried to get Mr. Edmonds to ride in the cab and said she would ride with me in the back. She told him this because he had an earache. I saw Mr. Edmonds, on the day Mrs. Edmonds was killed, when he came over to go wild-hog hunting and I saw him again, that day, about 12:30 or 1 o'clock. He came to my house looking for Raiford, and I told him he was up at the shop helping my brother fix a tire, and he asked if the truck key was there, and I told him if it was it was in the truck and if it was not there Raiford had it. . . On that occasion, so far as I could tell, he was not drinking. I never saw him drinking and I don't know whether he was drinking or not that day. . . I do not know of any fuss between Mr. and Mrs. Edmonds while they lived down there, near me. So far as I know they got along all right. . . On the Sunday morning before Mrs. Edmonds got killed, Mr. Edmonds acted perfectly normal except he complained of an earache."
Raiford Wilkes testified: "I have known Mr. Luke Edmonds about six weeks. I was with him the Sunday before his wife was killed. I went to his family reunion with him, and on that occasion he suffered with earache and during that week he suffered with his ear. Mr. Edmonds and I figured on going wild-hog hunting Saturday, but . . we didn't go and I said we would go the next morning. . . He called me and we went hog hunting and didn't find any and come on out of the field, down below his house at the gate, and stopped at his house. He said I'm going to take the gun out, I may go hunting late this afternoon,' and I told him all right, and he said that if I went to the store to stop *Page 116 
by for him, that he wanted to go with me to get some sugar and razor blades. I went in about an hour and I stopped and carried him with me and I got what I wanted and left him at the store. About dinner time I went back with my brother to get something and he got it and pulled back out and Luke went to his house with us. One of them had a blow-out below the house and I was helping with it and Luke went off. We taken the tire off and carried it up to the shop and was fixing it and Luke came up there and wanted me to carry him to Newton. He wanted me to call the boss. I told him he could take the truck and go, that I had company. He went with us to put the tire on and he got off at his house and we went on to my house for dinner, and while we were there Luke's little boy came running up there and said, `Daddy said come,' that he had shot his mother, and I said `Oh, no he hasn't,' I didn't believe it. I got out and went on down there, sure enough he had. She was lying on the bed and he was right side of her and he had a towel over her head and I moved the towel and looked at it and the blood was oozing out, and he said `What can I do,' and I said `Luke, I don't know.' He said he was going to kill himself, and I got out when he got up. When I went back up to his house, if he was drinking I didn't notice it. . . I worked with him six or seven weeks and outside the fact that he had occasional earache I didn't notice anything abnormal about him."
John Davis testified: "The day that Mrs. Luke Edmonds was killed, I was at Mr. James Jackson's house. Mr. Luke Edmonds came to Mr. Jackson's house to use the telephone, and I heard him say over the telephone that some of his relatives was critically ill in Newton and he wanted to use the truck. That was the same time that they were working on the tire out there at the shop. Q. At the time you saw Mr. Edmonds there talking over the telephone, did you talk with him? A. Yes. Q. Was he drinking? A. So far as I could tell he was not. He talked and acted perfectly natural."
Norman Edwards, half brother of the defendant, testified: That since 1936, when the defendant went to the hospital, he was not like he had been before that time, seemed strange and acted peculiar and seemed like he was a little off; that he constantly complained about his head and ear, and at a family reunion one week before the homicide, the defendant was suffering with his head, could not eat *Page 117 
dinner and had to be taken to bed; but that the defendant had held a job "pretty regularly," and if he lost any time from work on account of his headache, it would be only for a day or two at a time. (See defendant's statement infra, as to injury in 1936.)
J. F. Steadham, brother-in-law, testified: That after 1936 the defendant seemed as if something was worrying him and he did not have much to say; his manner of speaking seemed slow; he would break off a conversation and start talking about something not in the conversation, and complained about his head and ear; the defendant had regular jobs all along, and the witness thought that the defendant at times knew right from wrong, and at other times he did not.
Mrs. J. F. Steadham, sister of the defendant, testified: That after 1936 he at times wished to get off to himself, and just didn't act like he used to; that he would start talking and repeat himself and tell something over that he had already told, but that he worked normally like anyone else.
T. L. Edmonds, brother of the defendant, testified: That since 1936 the defendant seemed to want to be off to himself and appeared to be in a deep study or like something was bothering him; that in 1937 the defendant lived with another brother, Neal, in Fowlstown, and the witness visited them during that year. "Q. Do you recall any particular thing that Luke Edmonds did on that visit that was peculiar? A. Well, on the first visit me and one of my other brothers, Buck, were up there, we were living in Jacksonville, and we were up there and was going on a fish fry and picnic with Luke and Neal's family. We had talked over Luke's condition, and we felt like an outing like that would help him, and we went to this mill pond about two and a half miles from where they lived. After a while we missed Luke and we looked around there for him and couldn't find him and finally we came back to the house in the car. . . We came back to the house and found him in the back of the house plowing, and we didn't know what to think, we went out in the field where he was and asked him why he left, and he could not seem to remember at the time that he had been fishing. I have been living in Jacksonville since 1937, but would see Luke about twice a year. I knew about him complaining about his head and ear hurting him. My family have a reunion every year, and this past August I attended the reunion at Mr. Steadham's *Page 118 
house. I saw Luke there, he was very quiet that morning, but about the time the meal started he was taken with his head so bad that he had to be taken in the house and he was in there being doctored until he left, which was about three hours later. His wife and the girls were doctoring him to ease him. . . On the day of the picnic we went back to the pond and got the ladies and had our dinner at the house. Q. If Luke insisted on plowing, you were going to let him plow? A. No, sir, we didn't feel like he needed to be plowing or at the picnic, either one."
B. B. Edwards testified: "I married Luke Edmonds' sister and have known him all his life. . . I have known him well during those years. Prior to 1936 he was full of life and wanted to have a good time like all other boys; before that time I did not notice anything curious about him. Since he was operated on in Bainbridge, I have noticed that he was peculiar. I noticed the way he looked out of his eyes and some things he did. He has acted different since his head injury."
O. B. Edmonds, brother of the defendant, testified: "Prior to 1936 I did not observe anything out of the ordinary or peculiar about his [defendant's] conduct. Since that time he has had peculiar ways about different things, he has changed all the way around. He seemed in a way off distance at times; at times he seemed like things were way off and blank. He was operated on in Bainbridge hospital along about the last part of 1936. In 1937 my brother and I visited Neal, up at Fowlstown. Q. Did anything out of the ordinary happen on that visit, with reference to Luke? A. Yes, sir. Q. What was it? A. On that visit we all got together on a picnic and a fish fry, just the family, we all decided to go off and have a fish fry, and we all left and went down to this little place, a mill pond, about three miles from my brother's house, and Luke, my brother here, was along, and after we got down there he disappeared suddenly, and after a little he didn't show up and we went to inquiring about him and finally found him back at the house. We knew there was something wrong with him and we went back and got the rest of the folks and we came back to the house and ate dinner. . . That is the only time I ever saw him do anything I thought was crazy, that and his general conversation. He will talk about the same thing over and over. That was in 1937, he was farming with my brother, and he came back *Page 119 
and went to plowing. He was living at Fowlstown. . . I have been living in Jacksonville, but attend the family reunion every year. I attended the reunion last August and saw Luke there. His condition was pretty bad. He seemed to be getting along fairly well until we had dinner, and then he had a spell with his head and ear and we had dinner, and then he had a spell with his head and ear and he had to leave before he could eat. He had a bad spell for about two hours. . . His wife was there, she seemed to be alright, was solicitous of Luke's well-being and was interested in him. That [was] Sunday before she was killed the following Sunday."
Charles Martin, brother-in-law of the defendant, testified: That he know the defendant since 1933, and associated with him from 1933 to 1936, and during this time did not notice anything out of the ordinary about him. "Q. Since 1936 have you observed any change in him? A. Yes, sir, I can tell quite a bit of change, for instance, his peculiarities, his brogue and his conversation. Take from 1933 to 1936 during the time I worked with him, we were always playing and tusseling and running on and joking with one another and with everybody that came along. I moved off to Bainbridge and started to work, and he had some trouble with his head along about December of that year, and I didn't see as much of him then as before, but it seemed like he didn't have as much to say after I moved off from there, his mind was at random, at times he just didn't act like himself, he would sit off to himself and would have nothing to say, something that he never had done before. There was a definite change in him." This witness further testified: That in 1943 the defendant spent the night with him, was bothered with his head hurting, and couldn't sleep until given aspirin. Next morning the defendant went down the road near where the witness was working and waited until 11 o'clock trying to catch a ride. When the witness went to the house for lunch, the defendant said he would wait a little longer, but when the witness put up his mules and entered the house, the defendant was telling the witness's wife that he had been trying to get a job, and told the witness that he had talked to three men that morning in Bainbridge. "I asked him about his conversation with the people in Bainbridge about a job, and he stated three places he had been . . and I know positively that he had set on a log there by the road all that morning." *Page 120 
Elmer Durham testified that he worked with the defendant for Baker County in 1942, and it did not seem that he was right, that he was just curious.
W. B. Bates testified that he was road superintendent of Baker County, and employed the defendant to work on the roads for about three years starting in November, 1941, and noticed that the defendant was out of the ordinary and peculiar. The defendant could not remember what he was told to do, and having been told in the morning what should be done, during the day he would forget to do it and go on a road different from the one told. Once he had a row of 24-inch pipe to put in and a wooden water box to dig up. The defendant took it up and laid pipe in the road and filled up the hole so you couldn't get by there, and the next morning said that he had played the devil, that he had put in two lines of pipe. It appeared from the testimony of this witness that the defendant started working for the county in November, 1941, at $60 per month and worked until October, 1944, when he was drawing more money, and that he was only off a day or two at a time on account of headaches. This witness was asked, "Do you regard him [the defendant] as a man knowing the difference between right and wrong?" and answered, "Well, I hate to say it, but at times I don't."
Herbert Woodward testified for the State: That he employed the defendant for eight months commencing in November or December, 1944, and that the defendant was a good worker, could remember the things he was told to do, was a man of normal mentality, and in the opinion of the witness knew right from wrong; that the defendant left his employ because he did not take the interest in the work which he should have.
James Jackson testified that he was superintendent of the farm on which the defendant worked for six or eight weeks before the homicide, and saw him almost every day during that time. So far as the witness knew, the defendant was a man of sound mind, and the witness never worked a better man.
Several witnesses testified for the defendant that they did not know of any previous difficulties which he had had with his wife, to whom he had been married eleven years.
Several other witnesses were introduced on behalf of the State, but the foregoing statement includes all of the testimony that is deemed material for the purpose of review. *Page 121 
The defendant made the following statement to the jury: "Gentlemen, I will try to tell you the best I can about this. Anita and I were married the 18th of May, 1934, and we lived with my father on a farm until 1937. We were as happy as any two people could be. Along in the summer of 1936 I was helping my sister put her husband in the car and he either hit or cut my head, and Dr. Twitty took ten stitches to sew up the wound. Later in the fall my head was giving me so much trouble I could hardly stand it. I was carried to the Riverside Hospital in Bainbridge, and a Dr. Wheat and Dr. Chason operated on my head, they didn't know what it was. Soon after I received this injury on my head, I started having headaches and they continued. In the fall of 1937 I moved up to Newton, and the first part of 1938 I moved over to Milford on Mr. Jack Griffin's place, and people in that community began to have dances, and one night my wife said she was going to a dance with a neighbor, I tried to get her not to go but she went anyway. I was at home with my two babies that night, I had never worried about her before, I was up until 2 o'clock waiting for her to come in, and when she came and got out of the car I thought she was with Howard Tyson. I asked her about it, and she said Gene was not ready and she came with Howard. That worried me, but it seemed to pass off. Before that I had heard him talk about how he could handle women. I knew he made a lot of money bootlegging, and I was a half cropper and didn't make much, and it would look like to me he kept trying to rub it in on me about how he could handle women. About December I moved over away from there over to Mr. Oscar Irvin's place, and two or three times when I was in the field plowing I thought I saw Howard Tyson's car come up to my house, and the only time I had these thoughts about my wife was when my head got to hurting. Back in 1941 I moved to Newton and took a job with Baker County helping to work the roads and I stayed there until 1944. I moved out to Mr. Woodard's place from there, and my head seemed to get worse. We continued living there until June of this year and then I moved up to Pretoria to Mr. James Jackson's. On Sunday before my wife was killed we went down to Decatur County to a family reunion. Mr. Raiford Wilkes went with me. My head was giving me so much trouble that I had to stay in bed down there. On Monday morning I got up and went to work driving a tractor about *Page 122 
ten miles away from home, and I kept working and imagining these things about my wife and I suffered all of that week. I could not get any rest or sleep on account of it. On Sunday morning before that terrible thing happened Mr. Raiford Wilkes and me went wild-hog hunting. When we got back my wife wanted something from the store and I went and got it, and my head was already hurting me and I thought about her and Tyson and that is all I remember about it. They say I shot her; if I did, I don't know anything about it. I loved her more than anything in the world and I would not have done it for anything in the world. That is all I know about it."
1. In special ground 1, error was assigned on the following charge: "When testimony in the nature of alleged confessions is offered, it is for the jury to determine whether or not such alleged confession was, in point of fact, made or not, and if you believe there was a confession, then and in that event, the following principles of law would govern you in determining the weight of such testimony with reference to an alleged confession. All admissions should be scanned with care and confessions of guilt should be received with great caution. A confession alone, uncorroborated by other evidence, will not justify a conviction. To make a confession admissible, it must have been made freely and voluntarily, without being induced by another, by the slightest hope of benefit or the remotest fear of injury. If the jury should believe that a confession was made, but that it was induced by another by the slightest hope of benefit or the remotest fear of injury, then and in that event, it would be your duty to disregard that testimony.
"In order, however, for the hope of benefit or fear of injury, if any, to render a confession, if any, inadmissible, such hope of benefit or fear of injury must be induced by another. If you find there was hope or fear, yet if you find the hope or fear originated in the party's own mind from seeds of his own planting without being induced by another, and under the influence of a hope or fear thus originated, the defendant made a confession, this will not exclude the confession, if any, as evidence. The hope or fear that excludes is that, and that only, which some other person kindles or excites." *Page 123 
Several assignments of error were made on this charge, but the only contention urged with respect thereto in this court is that the evidence did not authorize a charge on the law as to confessions, because the statement of the defendant as introduced in evidence was at most only an incriminatory admission.
"Statements made by a defendant charged with murder, that he did the killing charged because of certain facts which, if true, furnished no legal excuse or justification therefor, amount to a confession." Jones v. State, 130 Ga. 274 (4) (60 S.E. 840); Jones v. State, 139 Ga. 104 (3) (76 S.E. 748);McCloud v. State, 166 Ga. 436 (2b) (143 S.E. 558);Coates v. State, 192 Ga. 130 (1), 134 (15 S.E.2d 240);Hixson v. State, 194 Ga. 568 (3) (22 S.E.2d 121);Wright v. State, 199 Ga. 576 (4) (34 S.E.2d 879). In the statement signed by the defendant the next day after the tragedy, he admitted the killing, and the only reason given by him was "that I was drunk and lost my head because my wife was arguing with me." Voluntary drunkenness is no excuse for crime. Code, § 26-403. Nor did the fact that the defendant's wife was arguing with him justify or mitigate his act in killing her. Accordingly, there is no merit in the contention that the evidence did not authorize a charge on the subject of confessions. The case differs on its facts from Allen v. State, 187 Ga. 178 (3) (200 S.E. 109, 120 A.L.R. 495), in which the accused admitted only that he struck the deceased, and not that he had killed her.
In special ground 2, error was assigned separately on the following part of the foregoing charge: "In order, however, for the hope of benefit or fear of injury, if any, to render a confession, if any, inadmissible, such hope of benefit or fear of injury must be induced by another. If you find there was hope or fear, yet if you find the hope or fear originated in the party's own mind from seeds of his own planting without being induced by another, and under the influence of hope or fear thus originated, the defendant made a confession, this will not exclude the confession, if any, as evidence. The hope or fear that excludes is that, and that only, which some other person kindles or excites."
The movant averred that this charge was not authorized by the evidence or his statement; that it assumed, without evidence, that "such confession, if any, was generated in the mind of defendant from seeds of his own planting," and was a direct expression of *Page 124 
opinion that a confession had been made, and was brought about by some hope or fear originating in the defendant's own mind from seeds of his own planting; and that it was misleading and confusing.
There is no merit in this ground. The Code, § 38-411, declares that, "To make a confession admissible, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit or remotest fear of injury." The except here complained of merely explained this section as related to hope or fear, and was in the abstract a correct statement of law. Hill
v. State, 148 Ga. 521 (4) (97 S.E. 442). The section itself had already been given in charge, and properly so under the evidence. Denson v. State, 150 Ga. 618 (2) (104 S.E. 780);Fairfield v. State, 155 Ga. 660 (7) (118 S.E. 395);McLemore v. State, 181 Ga. 462 (1) (182 S.E. 618, 102 A.L.R. 634); Phinazee v. State, 22 Ga. App. 258 (5) (95 S.E. 878). It necessarily follows that the explanation was, in like manner, authorized by the evidence. Nor was the charge erroneous, as insisted, on the ground that it was confusing and misleading.
Under the rulings made above, there was no merit in special grounds 3 and 4, assigning error separately on the last two sentences of the excerpt quoted above from special ground 2.
2. In special ground 5, error was assigned on the following charge: "Gentlemen, the court charges you that voluntary drunkenness is no excuse for crime. The fact that one accused of crime was drunk at the time of the alleged crime may be shown as illustrative of his motive in the transaction, but one voluntarily drunk is presumed to intend the legitimate consequences of his act, and the question is whether he intended to do the act and not whether he intended the consequences of the act. If a drunken man is sufficiently intelligent to know, understand, and intend to do a certain act, and to understand that a certain consequence is likely to result from it, and does the act, he is criminally liable."
Several assignments of error were made on this charge, one being that there was nothing to show that the defendant was drunk at the time of the homicide. While several witnesses testified in effect that they were in the presence of the defendant only a short time before the killing and he appeared to be entirely sober, there was other evidence as to drunkenness: Jimmie Edmonds testified: *Page 125 
"My mother asked my father to go to the store, at Pretoria. My father was sober when he left home. My mother told him not to drink any, and he went on down there and when he came back he brought a half pint of white whisky. . . My mother was fussing with my father about drinking liquor." In the defendant's signed statement, he said, "I went to the store and got some sugar and while I was there, I drank some wine. . . I bought a half pint of shine whisky. I drank some out of the bottle. In fact, I drank about half of the bottle. I went on home, and my wife began to argue with me because I was drinking. . . I got up off the front porch and went into the house. She stayed out there and kept on fussing. While I was in there I took another drink of whisky. . . The only reason I can give for killing my wife is that I was drunk and lost my head because she was arguing with me." The sheriff testified, "His appearance on the date of the shooting was that he was under the influence of intoxicating liquors." According to the deputy sheriff, "He was under the influence of some intoxicating beverage. He did not make any statement that evening as to his having drunk anything, but you could smell it." So, it can not be held that the charge on drunkenness was unauthorized, as insisted.
Nor was the charge subject to the criticisms, that it tended to mislead the jury into believing the defendant was relying on drunkenness as a defense, and that, having been given immediately following instructions on insanity, it was prejudicial to that defense, and influenced the jury to withhold a recommendation of life imprisonment. Dickens v. State, 137 Ga. 523 (5) (73 S.E. 826); Daniel v. State, 171 Ga. 335 (2) (155 S.E. 478). Nothing to the contrary was ruled in Martin v. State,193 Ga. 824 (2), 831 (20 S.E.2d 266). It follows that there is no merit in ground 5.
3. Special ground 6 assigned error on the following charge: "Preparation for the act of killing, lying in wait, previous difficulties, old grudges, threats to kill, and matters of that character may be some of the evidence tending to show express malice."
The movant alleged that this charge was not authorized by the evidence or his statement, and that it was highly prejudicial because of the peculiar nature of the only defense made by him, to wit, insanity, which plea within itself excludes all idea of malice."
In Wilson v. State, 33 Ga. 207 (3), it was held: "Where, in charging the jury, the court correctly states the law governing the *Page 126 
case, but exception is taken to an illustration used by the court explanatory of a legal principle, this court will not narrowly scrutinize the illustration if satisfied that, whether right or wrong, it was not calculated to mislead and did not in fact mislead the jury." In Hamilton v. State, 169 Ga. 613
(151 S.E. 17), it appeared that the killing occurred as the result of a sudden quarrel "over a few words." The court, after charging the Code definition of malice, stated to the jury, "as, for instance, a case of malice would be where a man arms himself and waylays to take the life of another." It was held that the charge did not constitute reversible error. See also Benton v.State, 185 Ga. 254 255 91) (194 S.E. 166); Adams v.State, 188 Ga. 668 (2) (4 S.E.2d 663); Cooper v.State, 197 Ga. 611 (4) (30 S.E.2d 177).
The judge charged fully on insanity as a defense, and the instruction complained of in this ground was not prejudicial to such defense. There is no merit in ground 6.
Grounds 7 and 8 were similar to ground 6, and are controlled by the ruling just made.
4. In special ground 9, error was assigned on the following charge: "An abandoned and malignant heart, in the sense of the law, is commonly held to be evidenced by a weapon or other appliance likely to produce death, and by the brutal and bloodthirsty use of such instrumentality." The judge had just given in charge the section of the Code on implied malice, and was here continuing his instruction on that subject.
The charge complained of did not contain an intimation or expression of opinion as to any issue of fact, nor did it deprive the defendant of his defense of insanity, as contended. Goosby
v. State, 153 Ga. 496 (5) (112 S.E. 467).
5. In special ground 10, error was assigned on the failure of the judge, without request, to give in charge Code, §§ 26-1006 and 26-1007, defining manslaughter and voluntary manslaughter. It is contended that such a charge was demanded by the following testimony of Jimmie Edmonds: "Before that he had been twisting her arm. She was asking him not to twist her arm. She told me to get the brush and hit him and I got the brush and hit him. He did not quit twisting her arm and I him another gain and he quit. "Q. How long was it after your father twisted your mother's arm before your father shot her? A. About three minutes." *Page 127 
The witness further testified: "The last thing my mother said to my father before he shot her she called him an ugly name."
"That which is perfectly justifiable on the part of the deceased can not be any legal provocation to the slayer." Lingo
v. State, 29 Ga. 470 (4); Mathews v. State, 125 Ga. 50
(1) (54 S.E. 196); Slocumb v. State, 157 Ga. 131 (7) (121 S.E. 116). "The killing of a human being, even in the heat of passion is murder, if the slayer have no just cause for his anger." Smith v. State, 49 Ga. 482.
According to the evidence, the deceased did not call the defendant an "ugly name" until after he had desisted from twisting her arm. Nor was there other evidence tending to show that his act of twisting her arm was justified. It thus appears without dispute that the deceased was entirely justified in calling upon the boy to aid her, and, accordingly, no issue as to voluntary manslaughter was involved. Thompson v. State,55 Ga. 47 (7); Hanye v. State, 99 Ga. 212 (2) (25 S.E. 307); Slocumb v. State, 157 Ga. 131 (7) (supra); Anderson
v. State, 196 Ga. 468, 471-472 (26 S.E.2d 755).
Under the facts appearing, the Code, § 26-1409, referring to opprobrious words or abusive language as possible justification for a mere assault or assault and battery, has no bearing upon the case; there being nothing to show that the deceased used any such language toward the defendant until after the assault and battery (twisting arm) had ended.
6. In special ground 11, error was assigned on the refusal of the court to admit in evidence a document purporting to be a certified copy of "report of physical examination" contained in files of Baker County selective service or "draft board," and stating that the defendant was disqualified for military service because of "simple adult mal. adjustment." The document as offered concluded with the following certificate:
"Georgia, Baker County.
"I, Lilliam Jackson Timmons, do hereby certify that I am the duly appointed and qualified clerk of the Selective Service Board of Baker County, Georgia. I further certify that the paper hereto attached and made a part hereof is a true and correct copy of the physical examination and induction report showing the reasons why Luke Randolph Edmonds was rejected by the armed forces. I further certify that the original is of file in my office. *Page 128 
"Given under my hand and seal this 24th day of September, 1945.
 "Lilliam Jackson Timmons (L. S.)"
The following objections were made by the solicitor-general: "Objects to what purports to be a certified copy of a physical examination of Luke Edmonds, on the ground that the doctor himself would be the proper way to show whatever they are undertaking to show. The fact that this man was rejected for military service would not show that he was crazy."
It is insisted for the plaintiff in error that the objections so interposed were invalid, and that the document was relevant and admissible as evidence of an official report or statement made in line of duty and contained in a public record. As to the admissibility of this general type of evidence, counsel for the plaintiff in error cites a number of cases, among them:O'Connor v. United States, 11 Ga. App. 246 (1) (75 S.E. 110); Kinney v. Avery Co., 14 Ga. App. 180, 183
(80 S.E. 663); Smith v. Savannah Electric Co., 25 Ga. App. 59 (4) (102 S.E. 548); McMillan v. Savannah Guano Co., 133 Ga. 760
(3) (66 S.E. 943); Sewell v. Tallapoosa, 145 Ga. 19
(3) (88 S.E. 577). More particularly, he cites and relies upon a Canadian case, Casey v. Kennedy (1920) 48 N. B. 85 (52 D. L. R. 326), holding that a medical-history sheet purporting to be the result of an examination of the plaintiff by a board connected with a medical military-service tribunal and claimed to be relevant to one of the issues, the action being one for assault and battery, was admissible in evidence as a public document, over the objection that it was hearsay; and holding further that, since this was the only objection urged, other possible grounds of objection relating to genuineness of the document were waived, especially as the plaintiff had requested the privilege of proving genuineness, which request the court thought it unnecessary to comply with. Quoted in 16 A.L.R. 247, case note. In the brief filed by the Law Department, attention is called to two cases holding that such evidence is hearsay and inadmissible. Laird v. Boston Maine Railroad, 80 N.H. 58 (114 A. 275,16 A.L.R. 243); Commercial Standard Insurance Co. v. Noack (Tex.Civ.App.), 45 S.W.2d 798. Seemingly, these three cases, and an English case, also cited in the A.L.R. note, are the only reported cases relating to the particular class of evidence, to wit, records of selective service *Page 129 
boards. At least, no others have been cited, and we have found none.
It is further insisted for the State that the records and files of a local draft board, especially in view of their partially confidential character under presently applicable regulations, do not constitute public records within the meaning of the rule invoked by the plaintiff in error. Selective Service Regulations, 1942-1943, 605.31, 605.32, 605.36; Evanston v.
Gunn, 99 U.S. 660 (25 L. ed. 306); Fritz v. Metropolitan Life Insurance Co., 50 Cal.App.2d 570 (123 P.2d 622). Compare 5 Wigmore on Evidence (3d, ed. 1940), 524, 525, § 1634. It is insisted also that the evidence was properly rejected because the certificate was not authenticated by the official seal of any Federal agency or department, but that in any event the ruling rejecting this evidence should be affirmed for the reason that it did not tend to show insanity.
There is no statute in this State bearing upon the admissibility of such evidence, other than those sections of the Code declaring, in mere general terms, certain common-law principles based on the best-evidence rule. Code, §§ 38-202, 38-204, 38-211. There is a general statute relating to the certificate or attestation of any public officer, either of this State or of any county thereof, but clearly this will not apply to the certificate of a Federal officer or employee. § 38-601. The full faith and credit statutes, both Federal and State, apply only to State records and proceedings. Moreover, aside from the full faith and credit clause of the Constitution, Congress would have no power to prescribe rules of evidence for State courts. Code, §§ 1-401, 38-627, 38-630; 28 U.S.C.A., §§ 687, 688;Small v. Slocumb, 112 Ga. 279 (3) (37 S.E. 481, 53 L.R.A. 130, 81 Am. St. R. 50). Thus, while there is another Federal statute providing that copies of books, records, or documents in any of the executive departments, "authenticated under the seals of such departments, respectively, shall be admitted in evidence equally with the originals thereof," this statute, as such, would not apply as a rule of evidence in a State court, although an authentication in the manner described might be accepted by a State court as being sufficient under common-law principles. 28 U.S.C.A., § 661.
From what has been said, it is clear that the admissibility of the evidence that was offered and rejected in the trial court must be determined on common-law principles but, as we view the case, a *Page 130 
decision upon only one of the several points mentioned will be necessary.
Regardless of all other questions, we do not think that the certified copy was sufficiently authenticated to make it admissible. In the recent edition of Wigmore on Evidence, it is stated: "Authentication of a Certified Copy. Suppose the law, in a given case, clearly to permit of a certified copy; it remains for the offeror to establish that the paper offered by him is indeed the certified copy allowed by the law — in short, toauthenticate it. For example, let it be settled that a custodian's certified copy is admissible, and let the public document whose contents are to be proved to be an order of survey by the county commissioners of highways; and let a paper be offered purporting to be a certified copy, by J. S. the county clerk, of the original warrant lawfully in his custody. Here it still remains to be ascertained that the county clerk is in fact the lawful custodian of that class of documents, that the person J. S. is in fact the county clerk, and that the signature of J. S. was in truth placed there by the genuine J. S. (or, if there is a seal, that the seal was genuinely his seal placed there by him).
"These three elements are necessarily involved in the admission of the paper offered — the authority of the county clerk, the incumbency of J. S. as clerk, and the genuineness
of the signature or seal. The establishment of these three elements is commonly spoken of as Authentication. Perhaps they may be assumed without evidence; or perhaps slight evidence will suffice, or perhaps definite kinds of evidence may be formally prescribed; but their establishment in some manner is inevitable. These elements are logically involved in the offer of evidence. Doubtless many who meet in practice the formalities of authentication, and do not attempt to analyze the principles involved, are apt to regard them as merely encrusted traditions or obnoxious technicalities having no reason for existence. But it is not so. Whatever the variety of mode or the seeming technicality of detail, these rules exist because there is an inherent element of fact that must somehow be met and disposed of." 5 Wigmore on Evidence (3d ed., 1940) 760, § 1679.
The author then goes on to discuss various methods by which such evidence may be authenticated, including judicial notice, official seals, and second official certificates.
Assuming that in this case the court might have taken judicial *Page 131 
cognizance of the regulations, and that they would have shown that the clerk of a local board would have authority to issue and deliver a certified copy of such a record, yet, since there was no proof whatever as to the incumbency of the particular person in such position or as to the genuineness of the signature, it was not error to reject the evidence. In People v. Reese,258 N.Y. 89 (179 N.E. 305, 79 A.L.R. 1329), it was held that a certificate signed by one describing himself as an officer of another State, without attestation by anyone as to his official character, the genuineness of his signature, and the regularity of his certificate, was not so authenticated as to be admissible in evidence. In the opinion, delivered by Chief Justice Cardozo, it was said: "There is nothing in this record to inform us whether the person whose name is affixed to the certificate is the incumbent of such an office. There is nothing to inform us (if he is the incumbent) whether his signature is genuine. Authentication is not merely defective. It is lacking altogether." The decision was manifestly based on common-law principles, and the result can not be different here because the certificate purported to have been made by the clerk of a Federal agency or board, rather than by a person describing himself as an officer or functionary of another State. See also Wigmore on Evidence (3d ed., 1940), §§ 1630, 1633, 1674, 1675a, 1677, 1680, 2161, 2169, 2576; 20 Am. Jur. 98, § 77, 834, 836, §§ 987-989; 32 C. J. S. 533, § 666; 5 L.R.A. (N.S.) 938, case note.
It is true that the solicitor-general objected to the evidence upon other grounds, and it does not affirmatively appear for what particular reason the judge excluded it. However, it is the rule in this State that, whether the objections urged to the admission of evidence be valid or invalid, a judgment excluding it will be affirmed if it was inadmissible for any reason. Steed v.Cruise, 70 Ga. 168 (4); Smith v. Page, 72 Ga. 539 (2a);Brunswick Birmingham R. Co. v. Hoodenpyle, 129 Ga. 174
(6) (58 S.E. 705); Heaton v. Hayes, 188 Ga. 632, 633 (2c) (4 S.E.2d 570). See also, in this connection, Morgan CountyBank v. Poullain, 157 Ga. 423 (4) (121 S.E. 813, 33 A.L.R. 592). The Canada case, relied on by counsel for the plaintiff in error, ruled differently, but as shown above, it appeared in that case that the party offering the evidence also asked the privilege of supplying proof as to genuineness; and in the opinion as to this point, it was said finally: "I think, under *Page 132 
the circumstances, the objection should be limited to the ground taken at the trial." Any way, the point is controlled by our own decisions, and we can not do otherwise than affirm the judgment excluding the proffered document. See Code, § 70-203.
In this view, it is unnecessary to deal with other questions relating to the admissibility of this evidence, and we express no opinion thereon.
7. The evidence authorized the verdict, and the court did not err in refusing a new trial.
Judgment affirmed. All the Justices concur.