PYLE *v.* THE STATE.

No. 12498.   NOVEMBER 22, 1938.   REHEARING DENIED DECEMBER 3, 14, 1938.

*Maddox & Griffin,* for plaintiff in error.

*M. J. Yeomans, attorney-general, J. Ralph Rosser, solicitor-general, J. Sanie Crawford,* and *Duke Davis,* contra.

BELL, Justice.   Cliff Pyle was convicted of murder in the killing of John Hibberts by shooting him with a shotgun, and was sentenced to life imprisonment, as recommended by the verdict.   His motion for a new trial was overruled, and he excepted.   The motion included assignments of error on portions of the court's charge and on refusal of requested charges.   The killing occurred at the home of the defendant late in the afternoon, or about dark, on November 7, 1937.   The defendant and the deceased had previously been on friendly terms.   They lived in the same neighborhood, and their wives were sisters. The evidence for the State tended to show

that on the occasion in question the deceased, while "drinking heavily," went to the home of the defendant and after entering the house cursed and abused the defendant because of some statement which he claimed to have heard the defendant had made concerning him. The defendant repeatedly declared that he had made no such statement, but the deceased would not be dissuaded, and continued to quarrel until his brother, L. W. Hibberts, arrived. All of this occurred in the home of the defendant and in the presence of his wife and of a young lady who was visiting them at the time. A difficulty was about to ensue, when L. W. Hibberts caught the deceased by the arm and endeavored to carry him away. According to the testimony of L. W., when they got to the outer edge of the porch, John, the deceased, started to make a step, and fell. After he had fallen and was on his hands and knees in the yard, the defendant ran out with a shotgun and fired the gun twice. When the first shot was fired, the deceased "raised up, . . and Cliff shot again, and he fell over like that." L. W. Hibberts further testified: At the time the deceased was shot, "he did not have any weapon of any kind in his hands. As to what my brother was doing to Cliff Pyle, if anything,—well, he was just trying to get up off of the ground where he fell." Callie Shelly, a witness for the defendant, who testified that she was at a house nearby and saw the shooting, gave a different version of the occurrence. She testified: "There were two men by the steps. One of them was close to the steps, and the other looked like he was either on the steps or going up the steps. Neither one of them was lying down. Then Mr. Cliff shot, and I turned; that was the first time he shot; he didn't hit anybody, not that I know of. He waited, I reckon, two minutes before he shot again. . . The one on the steps was facing him at the time he fired the gun, just standing on the steps or moving up the steps. The man on the steps was the one that was shot. I guess there are about six steps from the porch to the ground. I don't remember which one he was standing on. He had come up about one or two, and the other man was standing on the ground. I wasn't careful to notice where they were standing."

The defendant's statement was as follows: "On the 6th of November, John Hibberts come to my house with my wife's sister, and he says 'Marvin Jones told me that you accused me of stealing

some whisky from him,' and he and I talked about it and went over it, and he was confident I didn't accuse him of stealing no whisky. Finally he left on good terms, and we always had been friends before that time. On Sunday afternoon about six o'clock he come back to my home, and I was laying on the divanette reading a paper, and my wife was laying on the bed, and the Ray girl was playing the radio; and he come in and started to talking again about me accusing him of stealing whisky, and I sat there and talked to him some few minutes, and he kept on getting rougher and rougher, and L. W., his brother, come in, and when L. W. come in he says, 'Come on, John, Cliff ain't done nothing to you,' and he says, 'Yes, the [. . . . . . . . . .] did accuse me of stealing his whisky,' and I got up and was standing up in the floor. I was getting more than I could stand off of him, and I got up and walked to where he was at, and I said couldn't he get somebody that said it, that if he would I would tell anybody that was a lie that did say that, and he wouldn't listen to me, see, he just kept on cursing me, and with that he commences coming towards me and I grabbed a pair of pliers off of the mantel piece, and was intending to throw them at him, but my wife jumped up between us and he come out with his knife and I run behind the heater, and he tried to get me in there and I run back to the bedroom, and I waited for him to go on, I guess, a minute or two, and while I was waiting there L. W. got John out of the house, and I heard my wife holler, says, 'Here he is coming back in,' and when I got to the door he had started back up the steps, and I shot one shot to scare him, and he didn't pay any attention to it, just kept coming in and I threw up my gun and shot him, and my wife came on the porch later, and I told her to call the officers, and when they came I was out there and met them, and I told them, 'I want you to search John there for a knife,' and I stayed right there on the porch until the officers came, and my wife, she turned around and went back in the house, and I took that gun and handed it to Dorothy Ray to put it up, because the officers might want to think I might want to shoot some of them, you know; and when the officers came I walked out where they were at, and this policeman, Mr. Horace Stewart, flashed the light and he found that knife. I never had had any trouble with John at all; we had always been good friends, and as Mr. Stewart said he weighed one hundred and sixty-five pounds, and

I have not weighed over one hundred and forty in two or three years, and Dr. Routledge can tell anybody that. I knew before that that John had run his daddy off, that had come to see John, with a knife, and John was a good man during the week, but on Sunday he would get drunk, every Saturday and Sunday, and I had nothing against him, and I had to shoot there and had to protect my home and my wife and that little girl in there."

There was some evidence to the effect that the deceased took a knife from his pocket and opened it while in the house, and that after he was killed an open knife was found about a foot and a half from his left hand. Much other evidence was introduced, but the foregoing, including the defendant's statement, will be sufficient to illustrate the legal questions presented.

■ In the brief of counsel for the plaintiff in error it is stated that there was sufficient evidence to authorize the verdict if the jury believed the testimony of L. W. Hibberts, which they "apparently did." In view of this statement, the general grounds of the motion for new trial are treated as abandoned.

■ In special ground 1 the defendant assigned error upon the refusal of a request to charge on the subject of self-defense and defense of habitation, in the language of the Code, § 26-1011. In grounds 3, 4, 5, and 6 the defendant complained of the refusal of other requests to charge, based upon the theory of justifiable homicide in defense of habitation. There was no error in refusing to give any of the requested charges referred to in these five grounds. Neither the evidence nor the defendant's statement was sufficient to present any issue as to justifiable homicide in defense of habitation, and it appears from the general charge that the jury were fully instructed as to the law of self-defense. *Rumsey* v. *State,* 126 *Ga.* 419 (4) (55 S. E. 167); *Hollon* v. *State,* 137 *Ga.* 86 (4) (72 S. E. 949); *Devereaux* v. *State,* 140 *Ga.* 225 (6) (78 S. E. 849); *Waters* v. *State,* 146 *Ga.* 102 (3) (90 S. E. 712); *White* v. *State,* 2 *Ga. App.* 412 (58 S. E. 686). The defendant stated generally, "I had to shoot there and had to protect my home and my wife and that little girl in there," but from the particulars given by him it is apparent that the transaction did not involve any attack or invasion upon habitation. The case differs on its facts from *Horton* v. *State,* 110 *Ga.* 739 (4) (35 S. E. 659); *Palmour* v. *State,* 116 *Ga.* 269 (42 S. E. 512); *Downs* v. *State,* 175 *Ga.* 439 (4) (165 S.

E. 112); *Porter* v. *State*, 180 *Ga.* 147 (4) (178 S. E. 151); and other cases cited for the plaintiff in error.

■ The movant complains that the court erred in refusing to charge the jury as follows: "To manifestly intend an act implies more than mental resolution to do the act. The mental resolution must find some form of expression before it becomes manifest. In cases involving force, the slightest manifestation of intent to do the act would be an attempt in the accomplishment of the act." While identical language is contained in a former decision by this court (*Taylor* v. *State*, 121 *Ga.* 348, 357, 49 S. E. 303), under the facts of the present case the refusal to include the quoted statement in the charge to the jury was apparently not prejudicial to the defendant, and is not cause for a reversal.

■ In special ground 7 the movant complains of the refusal of a request to charge on the subject of reasonable fears. It appears from the record that the jury were instructed in a general way in regard to such defense. The requested charge wholly omitted the principle that to justify a killing under the doctrine of reasonable fears it must appear that the homicide was not committed in a spirit of revenge. As was held in *Johnson* v. *State*, 173 *Ga.* 734 (1), 740 (161 S. E. 590), "This made the instruction incorrect. It did not state an accurate and correct principle of law upon the subject of reasonable fears as justification for a homicide." See also *Head* v. *State*, 168 *Ga.* 843 (149 S. E. 145); *Hall* v. *State*, 133 *Ga.* 177 (2) (65 S. E. 400). Accordingly, in the present case the court did not err in refusing the requested charge on the subject indicated.

■ In ground 8 it is contended that the court erred in charging the jury as follows: "I charge you that you are the judges of both the law and the facts, in criminal cases. The law you take from the court as given you in charge, and the facts you get from the witnesses who testify, and from the statement of the defendant, and apply the law thus given you in charge to the facts ascertained in that way, and make a verdict which speaks the truth." It is insisted that this charge was limited to the testimony of witnesses and the statement of the defendant, and was thus erroneous in that it excluded from consideration "the photographs which were introduced in evidence by the defendant." The photographs were not embodied in the record as approved and transmitted to this

court, and consequently this ground of the motion fails to show the materiality of such photographs or that the defendant was harmed by the charge complained of. See, however, *Jones* v. *McElroy*, 134 *Ga.* 857 (5) (68 S. E. 729, 137 Am. St. R. 276); *Byrd* v. *Byrd*, 22 *Ga. App.* 354 (3) (96 S. E. 10).

■ In ground 9 the movant assigned error upon the following charge: "I charge you that you may look to the evidence and see whether the deceased had made some unjustifiable assault less than a felonious assault upon the defendant, and if so, see whether this assault upon the defendant on the part of the deceased had generated upon the defendant this uncontrollable passion supposed to be irresistible, and see whether he acted under the influence of that passion and not under the influence of revenge, and if you find him guilty, you could not find him guilty of murder, but would find him guilty of voluntary manslaughter, provided he was not justifiable in what he did, if he did anything." It is contended that this charge had the effect of withdrawing from the consideration of the jury "all other cause of uncontrollable passion supposed to be irresistible other than that which might have been generated by an unjustifiable assault upon the defendant," whereas under the evidence the jury might have found that there were "other equivalent circumstances to justify the excitement of passion," such as the entry of the deceased into the defendant's home and the profanity and abusive language then and there used by the deceased in the presence of the defendant's wife. Whether or not the additional facts here referred to might have been considered by the jury as "other equivalent circumstances," within the meaning of the law, the charge was not cause for a new trial, in view of the fact that immediately preceding it the judge charged the jury upon the subject of voluntary manslaughter in the language of the Code, with the following added: "Now, this is the law of voluntary manslaughter that you may apply to the facts of this case and determine whether or not, if he is not guilty of murder, he would be guilty of the offense of voluntary manslaughter." The charge of which complaint is made did not have the effect of withdrawing or qualifying the previous instruction, and was not erroneous as contended. As to this ground, the case differs from *Battle* v. *State*, 133 *Ga.* 182 (2), 185 (65 S. E. 382), where the judge specifically

charged that "other equivalent circumstances" had reference to an assault or other serious personal injury.

■ In ground 10 error is assigned upon the charge as a whole, on the ground that "the same was harmful, erroneous and prejudicial to movant for the reason that nowhere in said charge did said court instruct the jury as to the right of the defendant to protect his home or as to his right in reference to trespassers on his property." Under the rulings stated in the second division of this opinion, there is no merit in this ground. Furthermore, an exception to an entire charge is not good unless the charge as a whole is subject to such exception; and this was not true in the present case. *Baker* v. *State,* 154 *Ga.* 716 (3) (115 S. E. 119); *Cutis* v. *Geiger,* 176 *Ga.* 864 (5) (169 S. E. 127).

The court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., who dissents.*