1. Where on the trial of one indicted for murder, a witness testified that he had talked to the defendant "in jail, he sent for me one day and wanted to talk to me. He made a statement to me that he was drinking a little bit, and he said he wouldn't have done that if he hadn't been drinking," but testified to nothing else that would more clearly indicate the meaning of the statement, "he wouldn't have done that," and the defendant in his statement on the trial denied the killing — Held, that the evidence as stated above was insufficient to authorize a finding that the defendant admitted killing the deceased, and there being no other evidence of such an admission, it was error for the judge in his charge to the jury to submit to them as an issue of fact whether the defendant admitted the killing of the deceased with a deadly weapon as charged, and to instruct them that if they found the defendant did make such an admission, without any explanation showing excuse, alleviation, or justification tending to reduce the grade of homicide, then the law would presume the homicide to be malicious, and the burden would be upon the defendant to justify his action under some rule of law showing excuse, alleviation, or justification, to the satisfaction of the jury. Powers v. State, 172 Ga. 1 (30), 12 (157 S.E. 195); Allen v. State, 187 Ga. 178 (3) (200 S.E. 109, 120 A.L.R. 495); Leary v. State, 187 Ga. 445
(200 S.E. 779); Edmonds v. State, 201 Ga. 108 (39 S.E.2d 24); Pressley v. State, 201 Ga. 267 (39 S.E.2d 478).
(a) Under the ruling made above, grounds 4 and 5 of the motion for new trial as amended, complaining of an excerpt from the charge, were meritorious, and should have been sustained.
(b) There was no merit in grounds 6 and 7, complaining of the same excerpt, but for different reasons.
2. The court did not err, as contended in ground 8, in excluding the following testimony of the sheriff, who was sworn as a witness for the defendant: "McKinley Teasley came to me for protection sometime *Page 317 
about, I'd say about a week before this (referring to the time the deceased was killed) McKinley Teasley asked me for protection against Crawford Lyles and Lus Wells and Claud Gray. He told me these parties were threatening him." This evidence, if admitted, would have introduced self-serving statements of the defendant, and for this reason was objectionable and inadmissible. Dixon v. State, 116 Ga. 186
(2) (42 S.E. 357); Ware v. State, 139 Ga. 109
(76 S.E. 857); Pope v. State, 42 Ga. App. 680 (6) (157 S.E. 211).
3. A request to charge must be correct, even perfect; otherwise the refusal to give it will not be cause for a new trial. It must be legal, and precisely adjusted to some principle of law involved in the case. Etheridge v. Hobbs, 77 Ga. 531 (4) (3 S.E. 251); Lewis v. State, 196 Ga. 755 (3), 760 (27 S.E.2d 659); Grant v. Hart, 197 Ga. 662 (5), 676 (30 S.E.2d 271); Smithwick v. State, 199 Ga. 292 (6) (34 S.E.2d 28); Rogers v. Manning, 200 Ga. 844 (2) (38 S.E.2d 724). Under this rule, the court did not err in refusing to give to the jury the requested charge on unintentional killing, as set forth in ground 9, since the charge by its terms would have excluded all issue as to whether it satisfactorily appeared that "there was no evil design, or intention, or culpable neglect." Code, § 26-404; Griffin v. State, 183 Ga. 775, 783 (190 S.E. 2).
4. Nor, under the principles stated in the preceding paragraph, was it error to refuse to give the charge set forth in ground 10, since the charge as requested was so fragmentary and incomplete that it did not constitute a perfect charge on any grade of homicide. Tanner v. State, 161 Ga. 193 (13), 198 (130 S.E. 64).
(a) Considered as a request to charge on voluntary manslaughter, which is the only grade that is mentioned, it was incomplete and incorrect, for the reasons (if not also for others) that it made no reference whatever to excluding deliberation, malice, and revenge, and that it did not undertake to state the kind of passion that must exist in order to reduce the homicide. Code, § 26-1007; Rentfrow v. State, 123 Ga. 539 (2), 541 (51 S.E. 596); Pyle v. State, 187 Ga. 156 (4), 160 (200 S.E. 667).
5. For the reason indicated in paragraph 1, supra, relating to grounds 4 and 5, the court erred in overruling the motion for a new trial. No ruling is made as to the sufficiency of the evidence to support the verdict.
Judgment reversed. All the Justices concur.
 No. 15807. JUNE 10, 1947.
McKinley Teasley was convicted of murder in the alleged killing of Crawford Lyle in Barrow County on July 8, 1946. The verdict contained a recommendation to mercy, and the defendant was sentenced to life imprisonment. He moved for a new trial on the usual general grounds, and by amendment added several grounds. The motion as amended was overruled, and he excepted. *Page 318 
Although the following statement of the evidence is not exhaustive, it includes enough to illustrate the questions raised for decision.
Henry Finch testified: "I saw McKinley Teasley on the 8th of July this year, the day that Crawford Lyles was shot. I saw him first on that night in the cafe in Glenwood, and that is in Barrow County. My other two brothers, Alfred and Charlie, was with me. I was in my car that night and McKinley Teasley asked me to take him somewhere; he asked me to ride him around first, and I told him I couldn't do that, and he then asked me to take him out to the forks of the river and I agreed to take him. . . I told him I didn't know where the forks of the river was, and he went to show me the way, and we started down the Jefferson highway and we come to a road that turns to the right, and he told me to take off to the right and we went off down that road a piece. The lights on the car wasn't burning good and I took off on that dirt road, I came to a car on that road, and he told me to stop there and wait a minute. I had never been there before. I stopped until he started shooting out the car. My car was on one side of the road and the other car was on the other side of the road when he started shooting. . . I didn't hear one word from either McKinley Teasley or Crawford Lyles. When I stopped the car McKinley Teasley got out of the car on the ground and started walking towards the car. He had a flashlight in one hand and a gun in the other. I wouldn't know what kind of a gun he had. It was a pistol and not a shotgun, and when he started shooting I left. I saw the boy in the car when he started shooting, but I didn't know who he was. He shot the boy sitting in the back seat . . I couldn't say exactly, but I heard two or three shots fired. I had stopped good. I saw the flashlight before he got out of the car, but I didn't see the gun, when I first saw the gun was after he had done left the car. I was driving the car and McKinley Teasley was sitting in the front seat with me. Both of my brothers were sitting in the back seat." The witness also testified: that the lights on the car where the shooting took place were burning at the time the car of the witness arrived there; that the defendant was drinking; that it was a very bright moonlight night; that the witness drove off after the shooting had started and before the third shot was fired; that he did not go to the garage *Page 319 
owned by a Mr. Bell the next morning, and did not have a conversation with Mr. Bell about the shooting that morning; and that he had talked about it since then at a time when Mr. Arthur De LaPerriere was present.
Charlie and Alfred Finch, brothers of Henry Finch, substantially corroborated his testimony, although Charlie stated, "There wasn't any lights on the car that was parked," and that it was a dark night, so dark he could not see more than 15 feet in front of himself, and Alfred stated, "It wasn't a dark night and I wouldn't say it was bright, it was just twixt and between."
Buster Thornton testified: "I live down off the Jefferson highway about 4 miles in Barrow County. I remember the night of July 8th this year when Crawford Lyles was shot there in front of my house. I was right at the far corner of my kitchen going around the house when Crawford was shot. I don't know how long Crawford had been there in front of my house when he got shot but he hadn't been there so long. . . There wasn't any commotion in the car before the shooting took place, it was just like that and it was all over with. . . I seen the car that drove up that McKinley Teasley was riding in from the corner of my house. . . It hadn't been there but a few minutes when the shooting took place. I saw this other boy, John Louis Lyles. . . I didn't see him when he got shot, as he was going on to the car as I was going around the house. . . I saw McKinley Teasley that night, he came back to the window and was talking to my wife, and he said he wanted to see the boy. He was talking about his boy, I reckon, the one I been had all of his life. The boy is five years old. McKinley Teasley supports him, he gives my wife $1.50 a week. It is Odessa's child. . . It was about ten minutes after the shooting before McKinley come that night. . . McKinley went on down the road after the shooting, and he come back about 10 minutes afterwards, and they talked a while then he come on up this way. I didn't see him with no pistol. He didn't stay there at the window but a few minutes. He didn't talk to Odessa. I have talked to McKinley since he has been in jail, he sent for me one day and wanted to talk to me. He made a statement to me that he was drinking a little bit, and he said he wouldn't have done that if he hadn't been drinking. He did not make any statement at that time in regard to the child." *Page 320 
Thornton testified on cross-examination: "Odessa and my wife heard this conversation between me and McKinley. Odessa is my sister-in-law. I told you and Mr. Arnold when you all come down to my house that I was sitting in the door, but I wasn't sitting in the door, but I told you that. . . Some of the things that I told you and Mr. Arnold when you was down there was true, and some of them wasn't. . . I couldn't see the shooting from where I was. I told you that day that I saw the shooting, but I couldn't see the [shooting] from where I was. The truth is I didn't see the shooting. I could just see the fire it looked like. . . I thought I told you and Mr. Arnold that Odessa was out in the yard and not in bed, but I made a mistake and I might have made another mistake. Up in your office I might have told you that there was scuffling and the car was going down the road, but it might have been a door slammed or something nother, but I told you that. I told you in the office that the shooting happened right after the scuffling and that was the truth, the shooting happened right after the scuffling."
This witness testified on redirect examination: "All the scuffle I heard was the door slammed. I don't know which car door slammed. I didn't see anybody go together scuffling. What I meant was that the car door slammed, shutting like that." On recross he testified: "I told you that as I came out of the front door I heard scuffling and car going down the road, and the door slam, I heard scuffling from the car. In the presence of Mr. Henry Oakley I told you about the scuffling out there at the car and the shooting happened right after the scuffling." On redirect examination the witness swore: "I had been to see McKinley Teasley in jail before I went to Mr. Quillian's office."
Dan Young, colored, testified that he was an undertaker, and prepared the body of Crawford Lyles for burial, and that there were three bullet wounds in his chest.
John Louis Lyles, a brother of the deceased, testified on direct examination: "Crawford and I were down to Homer Buck Thornton's on the night Crawford was shot. . . I was standing in the yard when they came down the road and the car didn't have no lights on it, and I heard the swing of the car, and he had a flashlight shining and he shined it in the car and commenced shooting, that all I know, and he shot I'd say about four times; then I *Page 321 
walked out there and he came around on the left side of the car, that's when he shot me. . . I ain't said nothing to McKinley before he shot me. He said something but I didn't understand it. . . The car that McKinley Teasley had got out of had done gone when he shot me. I don't know whether my brother said anything before he shot him or not. I didn't hear him say anything and Odessa didn't say anything. . . My brother never lived no time after he was shot. . . Before the shooting I saw Odessa, and she was standing out at the car with her foot on the running board. We had been out there about 45 minutes before the shooting. We was close to Bus Thornton's house. Odessa was down there, but I don't know whether it was Odessa's child or not. . . I know Odessa but just this year and last year is the onliest times that I have known her. Crawford had gone out there to see her. I don't know whether my brother had been going with Odessa or not. . . My brother and I had gone out to Bus Thornton's to take him out there. My brother didn't do anything when he got out there, he just went in and talked to Odessa for a while. Bus was in the house. Bus was there in the yard and I was standing there in the yard when the shooting took place."
On cross-examination this witness testified: "When this car came down the road, it didn't have any lights on it. . . It just came tearing down the road without any lights at all. . . Our car had the lights off. . . The automobile was headed toward Winder. . . McKinley was on the side from the house, and I was 15 or 20 yards down toward the house on the left-hand side. Odessa had her head in the back seat, and she was talking to Crawford. I was down in the yard on the opposite side of the car. . . When this Finch boy's car come down the road that night, McKinley just swung off of the car and the car was rolling along. . . He jumped off the car and the car didn't have any lights and I didn't have my lights on. . . I counted three times that he shot in the car, and when I came up he shot me. Odessa was sitting there with her head in that car when he drove up. I just seen the car coming along and I looked at it. . . The reason that I looked at it was that it didn't have no lights on it and the man was shining the flashlight." *Page 322 
On redirect examination Lyles swore: "I brought my brother to town that night, and I was shot in the leg. . . They had the inquest around 11 o'clock that night. . . I didn't see Odessa after the shots were fired before I was shot. I don't know where Odessa went after she left from there."
The State then rested, and several witnesses testified on behalf of the defendant. Y. D. Doster testified that he is Coroner of Barrow County, and held an inquest at the time Crawford Lyles was killed, and that John Louis Lyles was a witness, and said that there were no eyewitnesses to the shooting. "McKinley Teasley wasn't there until after the inquest was over and he came and turned himself in. I was there when he turned himself up, and he did not have a gun then."
J. J. Patrick testified that he sat on the coroner's jury when the inquest was held over Crawford Lyles, and that John Louis Lyles testified that he was in the house and heard the shooting, and ran out of the house and around the car and met the defendant, who shot him in the leg, and that nobody saw the shooting of Crawford Lyles.
Hoyt Bell testified: that he lives at Hoschton and is engaged in the garage business; that he knows the Finch boys, and saw them on the morning after Crawford Lyles was shot, did some work for them, lined the brakes and fixed the lights; that he asked them about the shooting, and they said they carried the negro off down there and he got out of their car and they drove off; and that they said they heard the shooting, but did not see it.
Arthur De LaPerriere testified: that he knew the Finch negroes; that since the killing of Crawford Lyles he saw them in Mr. Bell's garage about 9 o'clock one morning and heard them telling Mr. Bell about carrying a darky out in their car where they met up with another car and he got out and they drove off; they said they weren't there when the shooting occurred, but were satisfied this darky got shot. "About a week or ten days ago they was back up there and I asked them, I said, `You all didn't get mixed up in any way?' and they said, `No,' they didn't get mixed up in it, and they said they was down there and told it just about like they did the first time, said they were there but didn't see it."
The defendant's statement to the court and jury on the trial was in part as follows: *Page 323 
"So I got in the car with them boys, I got in the front seat and we started down there where we was going, I didn't tell them to take me any place; when we got near that house, this boy started turning the lights off and on, and I asked him what was the matter with it and he said nothing wrong with his battery; and we drove on up there just about in front of that house, and I looked and saw an automobile settin' on the side of the road, and I told him not to stop; he said I want to stop here about a minute, and he drove right on up to the side of that car, and I was setting there waiting for him to get out; and he said, `You'll have to get out where I can get out, my door won't open;' and I stepped out of the car, and when I stepped out of the car he drove off just as fast as he could, I stepped out of the car right at the back window of that automobile, and Crawford Lyles raised up in the back of that car and threw his pistol within my breath and said, `Oh, yes . . you been running around turning up folks for selling liquor, I want you to turn this up to Clay Camp,' and he said, `Now put up your . . hands,' and he poked it out to me, and I just went over with my hand a like that and caught the pistol and whirled it right around to his breast, and he slapped his hand on my hand like that, and I slapped my hand on his like that, and I tried to take the pistol away from him but he was too strong for me to, and the pistol got started to shooting, and he never did take his finger off of the trigger until the pistol quit shooting, and he turned it loose and I got it; and his brother come around the car and got a pistol out and poked it at me, and I shot him to keep him from shooting me; I didn't want to hurt him, and he got back in the car and drove off and I started on to town to the sheriff, I didn't have no flashlight and I do not own no pistol. I came right straight on to town and give up to the sheriff. And I paid that woman $1.50 a week for the support of my child down there. Gentlemen, I never had a fight in my life with nobody and I ain't no bad nigger and I don't own no pistol and never have. . . Gentlemen, I didn't see Bus Thornton when he come to jail; I heard somebody say he come down there, but I didn't talk to him, and I didn't say anything to him about drinking any liquor for I don't drink liquor."
John Orr testified that, while he was a policeman at Winder, "something like about a year" previously, he stopped a car Crawford *Page 324 
Lyles was riding in and searched it for liquor; that he found no liquor, but did find a 32-20 pistol like the one which the defendant delivered to the sheriff. The witness did not positively identify the pistol.
H. C. Camp testified: That he was Sheriff of Barrow County and attended the coroner's inquest, and heard John Louis Lyles testify; that he testified he didn't see anything, "he came out and found him in the car. He said there wasn't anyone saw [them] when he was out there when this nigger shot him;" that McKinley Teasley turned himself in to the witness that night; that Teasley had heart trouble and had been working for him for about a year since he was put off for a rest from the railroad where he previously worked.
The defendant then rested, and the State recalled John Louis Lyles, who testified: "I didn't have any pistol on me the night I was shot. I didn't have one in my hand before I was shot. My brother didn't have any pistol. . . I did not make any threats to McKinley Teasley before he shot me. . . I have never made any threats to him. I have never been present when my brothers made any threats to him."
Henry Finch, recalled, testified: "Me and my brother and Crawford Lyles had not been out to see Odessa before I took McKinley out there that night. I didn't ask McKinley to go out there to make up some trouble, some liquor report. I didn't tell him that I wanted him to go out there to make up some trouble with Crawford. I hadn't heard of any trouble between him and Crawford."
Alfred Willie Finch, recalled, testified: "On this night that Crawford Lyles was shot, neither me nor my brothers asked McKinley Teasley to go out there to settle some liquor. We did not discuss any trouble with McKinley about him and Crawford Lyles."
To the original motion for new trial containing the usual general grounds, the following special grounds were added by amendment:
Ground 4 complained of the following charge to the jury: "I charge you, gentlemen, that if you find from all the facts and circumstances of the case that the deceased, Crawford Lyles, was killed by a deadly weapon, and that the defendant, McKinley Teasley, before the trial of the case and after the killing admitted killing the deceased with a deadly weapon, as charged, without *Page 325 
having any explanation showing excuse, alleviation, or justification tending to reduce the grade of homicide, then the law would presume the homicide to be malicious and the killing to be murder, and then the burden would be upon the defendant to justify his acts under some rule of law showing excuse, alleviation, or justification to the satisfaction of the jury. And if this be not done, you would be authorized to find the defendant guilty of murder as charged in this bill of indictment."
It was alleged in this ground that the only evidence on the subject of any admission by the defendant was the testimony of the State's witness, Buster Thornton, as follows: "I have talked to McKinley Teasley since he has been in jail; he sent for me one day and wanted to talk to me. He made a statement to me that he was drinking a little bit and he said he wouldn't have done that if he hadn't been drinking."
Ground 5 contained substantially the same assignments of error on the same charge as those made in ground 4.
Ground 6 assigned the same charge as error, because it failed to instruct the jury that, in order to find the defendant guilty of murder, it would be necessary that they further find from the evidence and the defendant's statement, "some evidence to corroborate said admission, and thus the court charged the jury that the defendant could be convicted upon his admission alone, though uncorroborated or supported by any other evidence, when under the law in order for a defendant to be convicted upon confession or admission, such confession or admission must be corroborated by some other evidence."
Ground 7 complained of the same charge as follows: This charge was error because it so instructed the jury, "without instructing [them] that, in order to find the defendant guilty of murder, it would be necessary for the jury to further find from the evidence and the defendant's statement, or either, that the defendant killed the deceased with the character or kind of weapon charged in the indictment. This charge was hurtful to the defendant, because it had the effect [and] erroneously instructed the jury that, if the defendant admitted killing the deceased with any kind of deadly weapon without making an explanation that would reduce the crime from murder to a lower degree of homicide, and failed to show to the jury facts amounting in the opinion of the jury to *Page 326 
excuse, alleviation, or justification, the defendant could be found guilty of murder, whether the evidence or the defendant's statement showed that the defendant killed the deceased with a weapon of the kind or character charged in the indictment."
Special ground 8 assigned error on the court's refusal to admit in evidence the following testimony of H. C. Camp, Sheriff of Barrow County: "McKinley Teasley came to me for protection about, I'd say, a week before this (referring to the time the deceased was killed), McKinley Teasley asked me for protection against Crawford Lyles and Lus Wells and Claud Gray. He told me these parties were threatening him."
It was alleged that this evidence was relevant and admissible for the following reasons: (a) For the purpose of showing the defendant's motive in the transaction involving the death of the deceased, that is, whether he went to the place where the deceased was killed for the purpose of doing violence, or as contended he went to that place for a peaceable purpose, believing the deceased was not there. (b) For the purpose of showing a lack [of motive?] on the part of the defendant. (c) For the purpose of showing that the defendant acted under and was influenced by the fears of a reasonable man at the time of the killing of the deceased. (d) Said evidence was in the nature of original evidence and not merely hearsay evidence, in that it illustrated the defendant's motive and lack of malice at the time the deceased was killed.
Special ground 9 assigned error on the court's refusal to give to the jury the following charge, as duly and timely requested in writing by the defendant: "I charge you that, if one without provocation draws a pistol and points it at another, and such other person for the purpose of defending himself alone undertakes to take the pistol away from the person who points it at him, and when, in a struggle over the pistol which ensues, the pistol is unintentionally fired in such a manner as to kill the person who first drew it, the person who undertook to defend himself by taking the pistol from him who had drawn and pointed the pistol would not be guilty of any offense."
It was alleged in this ground that the requested charge was a sound legal principle applicable and material to the issues, and that the refusal to give the requested charge deprived him of having his main contention clearly presented to the jury for their *Page 327 
consideration, to wit, that the way in which the killing occurred was by the deceased having drawn and pointed a pistol at the defendant, and the deceased was killed by the pistol held by him having been accidentally fired in the struggle that ensued between the defendant and the deceased over the pistol.
Special ground 10 assigned error on the court's refusal to give to the jury the following charge as duly requested: "It is not necessary that there be some actual assault, some attack, some attempt to do a violent injury on the person killing, in order to reduce the offense from murder to manslaughter, provided there are equivalent circumstances to justify passion, the offense may be reduced from murder to manslaughter. For instance, if the jury believes in this case Crawford Lyles, armed with a pistol, pointed a loaded pistol at McKinley Teasley, and if the jury believes that the facts indicated an intention on the part of said Lyles to do McKinley Teasley some serious bodily harm, it is then for you jurors to determine whether these circumstances would be the equivalent of an assault on McKinley Teasley by said Crawford Lyles."
It was alleged in this ground that such requested charge was pertinent and relevant to the issues in the case, a good legal charge, and abundantly supported by the defendant's statement, in that said statement raised the issue as to whether the threats of the deceased made at the time of the homicide, together with his pointing a pistol at the defendant, were sufficient to arouse the passion of the defendant and thus reduce the offense from murder to manslaughter.