S96G0600. CITY OF ATLANTA v. WATSON et al.
(475 SE2d 896)

SEARS, Justice.

We granted certiorari in this case in order to (1) determine whether the City of Atlanta violated the equal protection rights of owners of multi-family residences near Hartsfield International Airport, when as part of its Airport Noise Abatement Program, the City purchased only single-family residences from their owners, and (2) consider two evidentiary rulings made by the Court of Appeals. We find that under the circumstances of this case, the City's purchase of single-family residences to the exclusion of their multi-family counterparts bears a rational relationship to a legitimate government interest, and therefore did not violate the equal protection rights of the owners of multi-family residences. We also find that the Court of Appeals erred in remanding to the trial court the issue of whether a federal statute prohibiting the recovery of damages for airport noise (49 USC § 47506) is applicable to this matter. We also disagree with the Court of Appeals' ruling that the trial court erred by excluding one of appellees' exhibits pursuant to the Aviation Noise Abatement Act (49 USC § 2106). Therefore, we reverse.

The appellant City of Atlanta ("the City") owns and operates Hartsfield International Airport ("Hartsfield"). The appellees are the owners of non-owner occupied, multi-family residences located in the City of College Park, Georgia, in close proximity to Hartsfield. Approximately 25 years ago, the City opted to participate in a federal

noise abatement program designed for airports that, like Hartsfield, receive federal funding. One of the stated goals of the noise abatement program is to reduce existing land uses that are incompatible with airport noise and to prevent the introduction of future incompatible land uses around airports.[1] The noise abatement program also is concerned with identifying and developing alternative land uses that are compatible with airport noise levels.[2]

In order to determine the extent to which existing land uses around Hartsfield were incompatible with noise generated by the airport, the City conducted a noise exposure study, which resulted in the development and implementation of a land use compatibility plan, known as the City's Aircraft Noise Exposure Maps & Noise Compatibility Program ("the Program"), intended to reduce incompatible land uses around Hartsfield. As part of the Program's initial phases, the City purchased single-family residences located near Hartsfield. The Program, in its initial phases, did not provide for the City's purchase of similarly situated multi-family residences, such as those owned by appellees. When the City refused to purchase appellees' properties, appellees filed suit, claiming inverse condemnation, nuisance, equal protection violations and violations of their rights under 42 USC § 1983.

Before trial, the appellees' section 1983 claims were dismissed by the trial court on the City's motion, and summary judgment was granted in favor of the City on the appellees' equal protection claims. Thereafter, in April 1994, the claims of inverse condemnation and nuisance were tried before a jury. At the conclusion of appellees' evidence, the trial court directed a verdict in favor of the City on the nuisance claim. After the jury was unable to reach a verdict on the remaining inverse condemnation claim, a mistrial was declared. After a second trial, the jury returned a verdict in favor of the City. Appellees' subsequent motions for new trial and judgment notwithstanding the verdict were denied.

The Court of Appeals reversed the trial court's grant of summary judgment to the City on appellees' equal protection claim, and concluded that the City's decision initially to purchase only single-family residences as part of its Program did not bear a rational relationship to the legitimate purpose of reducing land uses around Hartsfield that are not compatible with the noise generated by the airport.[3] In so doing, the appellate court invalidated the distinction drawn by the City between single and multi-family residences by focusing almost exclusively on the City's argument that its study established that

---

[1] 49 USC § 47504 (b) (1) (B).
[2] 49 USC § 47502 (3).
[3] *Watson v. City of Atlanta*, 219 Ga. App. 704 (466 SE2d 229) (1995).

multi-family residences are less affected and more compatible with noise generated by the airport than are single-family homes. Rejecting that argument, the Court of Appeals reasoned that the City had drawn an arbitrary distinction between two identical groups — both of which are residences located in the same vicinity to the airport — with no objective basis for doing so, and remanded the equal protection issue to the trial court. The Court of Appeals also remanded the issue of whether the trial court had correctly charged the jury on a federal statute (49 USC § 47506) without first determining whether it was applicable to the facts of this matter, and ruled that a different federal statute (49 USC § 2106) did not preclude admission of the appellees' exhibit showing land uses compatible with airport noise.

1. The Georgia Constitution states that a paramount duty of government shall be to ensure the protection of persons and property, and that in discharging that duty, "[n]o person shall be denied equal protection of the laws."[4] The Georgia equal protection clause, which is construed to be consistent with its federal counterpart, requires that the State treat similarly situated individuals in a similar manner.[5] A successful equal protection challenge generally requires a showing that state action was undertaken with an unreasonable purpose or was arbitrary and capricious.[6] However, under our equal protection clause, State legislative classification " 'is permitted when the classification is based on rational distinctions and . . . bears a direct and real relation to the [legitimate] object or purpose of the legislation.' "[7]

If the State's classification operates to the disadvantage of a suspect class or impedes the exercise of a fundamental right, it is tested under a standard of strict judicial scrutiny.[8] We agree with the Court of Appeals, however, that because there is no showing that the classification in this appeal involves either a suspect class or the exercise of a fundamental right, we must examine it under the lesser "rational basis" test and determine only whether it bears a reasonable relationship to a legitimate purpose of government.[9] The rational basis test requires that the classification drawn by the legislation be reasonable and not arbitrary, and rest upon some ground of

---

[4] Ga. Const. (1983), Art. I, Sec. I, Par II.

[5] *Chatterton v. Dutton*, 223 Ga. 243, 245 (154 SE2d 213) (1967); see *Yick Wo v. Hopkins*, 118 U. S. 356, 373-374 (6 SC 1064, 30 LE 220) (1886); *Barge-Wagener Constr. Co. v. Morales*, 263 Ga. 190, 192 (429 SE2d 671) (1993)..

[6] See *Washington v. Davis*, 426 U. S. 229, 239-242 (96 SC 2040, 48 LE2d 597) (1976).

[7] *Home Materials v. Auto Owners Ins. Co.*, 250 Ga. 599, 600 (300 SE2d 139) (1983); see *State Farm Mut. Auto. Ins. Co. v. Five Transp. Co.*, 246 Ga. 447 (271 SE2d 844) (1980).

[8] *Ambles v. State*, 259 Ga. 406, 407 (383 SE2d 555) (1989).

[9] *Bowman v. Knight*, 263 Ga. 222, 223 (430 SE2d 582) (1993). See *McDaniel v. Thomas*, 248 Ga. 632, 637-638 (285 SE2d 156) (1981); *Watson*, 219 Ga. App. at 706.

difference having a fair and rational relationship to the legislation's objective, so that all similarly situated persons are treated alike.[10]

" ' "If [it is found that] the legislative purpose is legitimate and the classification drawn has some reasonable relation to furthering that purpose, the classification passes [constitutional] muster." ' "[11] A classification will be upheld in the face of an equal protection challenge so long as, "under any conceivable set of facts, [it] bears a rational relationship to a legitimate end of government not prohibited by the Constitution."[12] In this regard, the party who challenges legislation on equal protection grounds bears the burden of establishing that " 'the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the government decisionmaker.' "[13]

Bearing these principles in mind, we turn to this matter. As noted, the Court of Appeals' conclusion that the City had violated the equal protection rights of owners of multi-family residences was based upon its rejection of the City's claim that its study showed that such residences are more compatible with airport noise than are single-family residences. Pretermitting the propriety of this conclusion, we find that the Court of Appeals erred by ending its inquiry at this point, without examining the other justifications supported by the record in defense of the City's classification between single and multi-family residences.[14] As explained below, our review of the record as a whole shows that the City's initial purchase under the Program of only single-family homes was rationally related to the legitimate governmental purposes of reducing land usage incompatible with airport noise in a sound fiscal manner while simultaneously avoiding the virtual elimination of the City of College Park's residential basis. Furthermore, in light of the evidence of record concerning the occupancy rates of multi-family residences in College Park, it appears that the City's decision initially to purchase only single-family homes was reasonable and not arbitrary.

The record shows that the City's Program estimated that the relocation of all families living within noncompatible airport noise level areas (an estimated 81,183 people, residing in 16,000 single-family residences and 8,000 apartment complexes), would cost the City in excess of $900 million, as measured in 1984.[15] At the time

---

[10] *Allrid v. Emory Univ.*, 249 Ga. 35, 38 (285 SE2d 521) (1982).
[11] *Smith v. Cobb County-Kennestone Hosp. Auth.*, 262 Ga. 566, 570 (423 SE2d 235) (1992).
[12] *Craven v. Lowndes County Hosp. Auth.*, 263 Ga. 657, 659 (437 SE2d 308) (1993).
[13] Id.
[14] See n. 12, supra, and accompanying text.
[15] Naturally, this amount increases when the time value of money is taken into consideration.

that appellees filed their lawsuit, the City only had sufficient funds to enable it to purchase single-family homes that were non-compatible with the airport noise. Thus, the decision was made that, in the initial phase of the Program, only owner occupied, single-family residences would be purchased, although the Program provided that thereafter, the purchase of other types of residences located in unacceptable airport noise areas would be considered.[16] This decision appears to have been reasonable, given that the City's study revealed that even though they were affected by airport noise, non-owner occupied multi-family residences remained 96-98 percent occupied. This would indicate that appellees' ownership interest in these multi-family residences, while possibly feeling some impact from the airport noise, could probably withstand exclusion from the Program's initial phase without suffering a corresponding loss of tenant occupancy.

Furthermore, even if we assume arguendo that the City had the financial resources in 1984 to have purchased all residences adversely affected by the airport noise, to have done so would have wreaked havoc on the City of College Park's residential base — the foundation of its infrastructure, business community, and congressional districting.[17] Had the City effectively relocated over 81,000 people from College Park to other communities at once, rather than in stages, there would have been no opportunity for the redevelopment of land formerly occupied by single-family residences with the establishment of businesses that are compatible with airport noise — a stated goal of both the federal noise abatement program and the City's Program. As shown by the City's 1985 amendment to the Program, there has been an effort made to facilitate such redevelopment of land formerly occupied in College Park, and to attract new businesses that are not adversely affected by airport noise to that land, thereby ensuring to some extent that College Park retains a residential structure upon which it can survive.

Moreover, it bears emphasizing that the Program states that residences such as those owned by appellees will not be purchased during its *initial phase*, but expressly leaves open the possibility that such residences will be purchased during a later phase of the Pro-

---

[16] The Program stated:

In general, single-family residences will have first priority in the initial 6 year program in order to treat the greatest number of people most adversely affected by airport noise within the given funding considerations.

. . .

[Thereafter], consideration will be given to treating other noise sensitive uses such as tenant occupied . . . residences.

[17] The Program was intended in part to "minimize to the greatest extent possible the loss of the tax base and utility services as well as the disruptions to the local community."

gram. In this regard, it is obvious that appellees were not treated by the City in the exact same manner as were owners of single-family residences. However, that fact, standing alone, does not constitute an equal protection violation in this case.[18] In order to survive an equal protection challenge such as the one in this appeal, "[i]t is not necessary that the [City's] classification scheme be the perfect or the best one; nor do we focus on [its] fairness."[19] In its effort to reduce land uses that are not compatible with airport noise, while simultaneously fostering other land uses that are compatible with such noise, the City may draw classifications without violating appellees' equal protection rights so long as such classifications are reasonable and not arbitrary and have a fair and substantial relationship to the City's legitimate objectives. For the reasons explained above, we find that the classifications drawn by the City between single-family and multi-family residences bear a rational relationship to the legitimate governmental purpose of reducing land use incompatible with airport noise in a sound and responsible fiscal manner, while simultaneously avoiding the virtual elimination of College Park's residential basis and the resulting negative impact on its business community and infrastructure. Therefore, the classification drawn by the City between the two types of residences does not violate the constitutional guarantee of equal protection, and we reverse the contrary ruling by the Court of Appeals.

2. Appellees argued before the Court of Appeals that the trial court had erred in charging the jury on 49 USC § 47506, which provides that unless specified criteria are satisfied, no person who acquires property after 1980 in an area for which an airport noise exposure map has been submitted may recover damages for noise attributable to the airport, if the person had actual or constructive knowledge of the map's existence. As noted by the appellate court, the trial court had denied the City's claim in its motion for summary judgment that it was immune from damages for airport noise under § 47506, because questions of fact remained concerning the statute's applicability. The Court of Appeals concluded that as a matter of law, § 47506 does apply to this matter, and that the trial court's jury charge on the statute was a correct statement of the law. Nonetheless, the Court of Appeals found that the trial court erred by charging the jury on § 47506 without first resolving whether the statute applies to the facts of this matter, and remanded that issue for the trial court's determination. For the reasons explained below, we now reverse that ruling.

---

[18] See *Barge-Wagener*, 263 Ga. at 192.
[19] *Bowman*, 263 Ga. at 223.

By its terms, the applicability of § 47506 to a state court action is a mixed question of law and fact. As a matter of law, we conclude that the Aviation Safety Noise Abatement Act of 1979 ("the Noise Abatement Act"), of which § 47506 is a part, preempts state law with regard to suits seeking redress for airport noise.[20] Thus, we agree with the Court of Appeals that, as a legal matter, § 47506 applies to this case.[21] Moreover, our review of the record confirms that the trial court's charge to the jury on § 47506 was a correct statement of the law.

Thus, the only issue remaining before the trial court was whether § 47506, when applied to the facts of this matter, precluded appellees from recovering damages; i.e. — (1) whether, at the time they acquired their property, appellees had actual or constructive knowledge that an airport noise exposure map had been submitted for the region encompassing their property, and (2) whether any of the specified criteria existed that would permit appellees to recover damages, notwithstanding their actual or constructive knowledge of the map's submission.[22]

Contrary to the Court of Appeals' reasoning, once the trial court reviewed the evidence introduced at trial and tailored its jury charge to fit that evidence, the trial court's denial of the City's summary judgment motion due to unresolved factual issues concerning § 47506's applicability became irrelevant.[23] So long as the evidence supported a giving of the jury charge on § 47506, once the trial court gave a proper charge, any factual dispute concerning the statute's applicability to this case became a matter for the jury, the ultimate finder of fact. Having reviewed the record, we find that the evidence introduced at trial clearly supported the giving of the charge.[24] Thus, to the extent there was any factual dispute regarding § 47506's application to this matter, it was resolved by the jury during deliberation. It follows that the Court of Appeals erred in remanding this factual issue to the trial court for its determination.

---

[20] See *Adams v. City of Atlanta*, 253 Ga. 581 (322 SE2d 730) (1984) ("[f]ederal law and regulations preempt local control of airspace management, air traffic control, and aircraft noise and emissions."). See also discussion in Division 3, infra.

[21] Accordingly, we reject appellees' argument on appeal that application of the statute in this case will unconstitutionally preempt their state claim for inverse condemnation.

[22] See 49 USC § 47506.

[23] See *Quinn v. Rainwater*, 124 Ga. App. 374 (183 SE2d 629) (1971); see also *Talmadge v. Talmadge*, 241 Ga. 609 (247 SE2d 61) (1978).

[24] See *White v. Archer Daniels Midland Co.*, 180 Ga. App. 829 (350 SE2d 788) (1986). There was extensive testimony given by the individual responsible for the maps' preparation and submission, which included descriptions of the areas included within the maps, and the corresponding noise levels included therein. We note that because the evidence supported the giving of the charge, the trial court properly disregarded appellees' timely objection that the charge did not conform to the evidence.

3. The trial court excluded from evidence appellees' Exhibit 19-A, a land use compatibility guideline chart showing land uses alleged to be compatible with airport noise. The guideline chart was prepared by the City as part of its noise exposure map, and the trial court had ruled that the Noise Abatement Act precluded its admission. Section 47507 of the Noise Abatement Act generally prohibits the admission of any portion of a noise exposure map or related information in a suit for damages due to airport noise.[25] The Court of Appeals reasoned that because Georgia procedural law contains no prohibition against evidence such as the land use compatibility chart, the trial court erred by excluding the chart. Because we determine that the Supremacy Clause renders 49 USC § 47507 enforceable in state courts, we reverse the Court of Appeals on this issue.

Congress retains authority under the Supremacy Clause to preempt state law when it so directs.[26] When faced with the issue of whether a state court must apply a federal statute over a state statute or rule of law, the primary question is whether Congress intended to exercise this authority to set aside state laws.[27] Although no other state has considered whether § 47507 is applicable in its courts, the federal statutory scheme and its legislative history make clear that Congress intended state courts to apply § 47507.

Section 47507 is part of a larger federal statutory scheme enacted because Congress determined that aviation noise management is vital to a national air transportation system.[28] This statutory scheme encourages airport operators to submit noise exposure maps and to develop a noise compatibility program to reduce existing noncompatible uses in the areas shown on the map. Airport operators who submit maps and who propose programs are eligible for federal funds to carry out the programs.[29] Section 47507 is an integral part of this broad federal statutory scheme in that it encourages airport operators to prepare maps by deeming such maps inadmissible in damage suits against the operators for noise resulting from the airport. If these maps, created in reliance on the promise that they would be inadmissible in damages suits, could be admitted in state court, the federal plan to reduce noncompatible land uses would be

---

[25] 49 USC § 47507.

[26] U. S. Const., art. VI, cl. 2. As a general matter, it is true that, aside from the Full Faith and Credit Clause, Congress has no power to prescribe rules of evidence for state courts. *Edmonds v. State*, 201 Ga. 108, 129 (39 SE2d 24) (1946). However, as explained infra, we find that § 47507 is an indispensable component of a complex statutory scheme regulating airport noise, and thus cannot be deemed a mere "rule of evidence." This conclusion is bolstered by the legislative history of § 47507, also discussed infra.

[27] *Barnett Bank v. Nelson*, 517 U. S. ___ (116 SC 1103, 1107, 134 LE2d 237) (1996).

[28] See 49 USC § 47521.

[29] 49 USC § 47504.

thwarted. Therefore, the vitality of the act may only be preserved by enforcing § 47507 in state courts, where most damage suits against airport operators are brought.

Additionally, the legislative history suggests that Congress intended § 47507 to be applied in state courts. When Congress first passed § 47507 in 1980, it did so knowing that state courts had applied comparable federal laws to exclude evidence in state courts. The Senate Report[30] expressly refers to similar statutes, 49 USC § 320 (f),[31] and 45 USC § 41.[32] These statutes prohibit admission of reports created under certain federal laws in "any civil action." Thus, they are virtually identical to § 47507's prohibition on use of noise maps in "a civil action." Long before the enactment of § 47507, state courts had applied these statutes.[33] Thus, the express reference to these similar statutes in the legislative history of § 47507 supports the conclusion that Congress intended that section to apply in state courts.

This conclusion that state courts are bound by § 47507 is further bolstered by the treatment courts have given to 23 USC § 409, which denies admissibility to reports relating to highway improvement projects in actions for damages arising from highway accidents. Uniformly, courts have held that § 409 is applicable in state court.[34] These courts recognize that when a statute that has evidentiary implications is part of a larger federal statutory scheme, the Supremacy Clause demands that states adhere to the statute. To hold otherwise defeats a significant purpose of the federal act and cannot be justified in light of the Supremacy Clause.

Accordingly, we find that when enacting 49 USC § 47507, Congress intended to exercise its power under the Supremacy Clause

---

[30] Senate Report 96-52, Commerce, Science and Transportation Subcommittee, dated March 29, 1979 at 22.

[31] This provision is now codified as 49 USC § 504 (f).

[32] This section is now codified as 49 USC § 20903.

[33] See *Torchia v. Burlington Northern, Inc.*, 568 P2d 558, 566 (Mont. 1977), cert. denied, 434 U. S. 1035 (98 SC 770, 54 LE2d 783) (1978); *Craddock v. Queen City Coach Co.*, 141 SE2d 798, 799-800 (N.C. 1965); *Louisville & N. R. Co. v. Stephens*, 182 SW2d 447, 457 (Ky. 1944); *Gerow v. Seaboard A. L. R. Co.*, 123 SE 473, 474 (N.C. 1924); *Greater Coastal Exp. v. Schruefer*, 369 A2d 118, 130 (Md. App. 1977); *Hines v. Kelley*, 252 SW 1033, 1037 (Tex. Com. App. 1923).

[34] See *Southern Pacific Transp. Co. v. Yarnell*, 863 P2d 271, 273 (Ariz. App. 1993) (expressly relying on Supremacy Clause), vacated on other grounds, 890 P2d 611 (Ariz. App. 1995); *Sawyer v. Illinois Central Gulf R. Co.*, 606 S2d 1069, 1073-1074 (Miss. 1992) (same); *Wiedeman v. Dixie Elec. Membership Corp.*, 627 S2d 170, 172 (La. 1993) (same), cert. denied, 511 U. S. 1127 (114 SC 2134, 128 LE2d 864) (1994); *Fuester v. Conrail*, No. 91C-09-013 (Del. Super. July 12, 1994) (available at 1994 Del. Super. LEXIS 383); *Claspill v. Missouri Pacific R. Co.*, 793 SW2d 139, 140-141 (Mo. 1990) (rejecting 10th amendment challenge to applicability of § 409 in state court), cert. denied, 498 U. S. 984 (111 SC 517, 112 LE2d 529) (1990); *Wright v. Norfolk & Western R. Co.*, 427 SE2d 724 (Va. 1993).

and preempt state law with regard to the admissibility of airport noise exposure maps and related information in state suits seeking damages due to airport noise.

*Judgment reversed. All the Justices concur, except Carley, J., who concurs specially as to Division 2.*

CARLEY, Justice, concurring specially.

At issue in this case are the Landowners' claims for damages allegedly resulting from the noise generated by the operation of the City's airport. I concur fully in Division 1, wherein the majority holds that the Court of Appeals erroneously reversed the trial court's grant of summary judgment to the City on the Landowners' equal protection claim. I also concur fully in Division 3, wherein the majority reverses the holding of the Court of Appeals that the trial court committed an evidentiary error during the trial of Landowners' inverse condemnation claim. As to Division 2, wherein the majority reverses the Court of Appeals' remand for a determination by the trial court of the "applicability" of a jury charge on 49 USC § 47506 to the Landowners' inverse condemnation claim, I concur, but I do not agree with all of the reasoning contained in the majority opinion. Accordingly, I concur specially in the judgment of reversal of the Court of Appeals.

By its terms, 49 USC § 47506 provides that a person acquiring an interest in property after February 18, 1980,

> in an area surrounding an airport for which a noise exposure map has been submitted . . . and having actual or constructive knowledge of the existence of the map may recover damages for noise attributable to the airport only if

certain specified criteria are satisfied. A charge on this federal statute was given in this case. After determining that the language of the charge tracked the language of the statute, the Court of Appeals concluded that the charge "was a correct statement of the law." *Watson v. City of Atlanta*, 219 Ga. App. 704, 707 (2) (466 SE2d 229) (1995). The Court of Appeals then held that,

> [h]owever, the trial court never ruled on the applicability of the charge to this particular case. The record shows that the City argued in its motion for summary judgment that it was immune from damages for noise under the statute. [The Landowners'] response to the motion included the argument that the statute did not preempt their state eminent domain rights. The court denied the motion, finding that issues of fact remained as to the applicability of the statute. Our review of the record and transcript does not show that the question of the applicability of the federal law was ever

resolved by the court. Thus, we remand this issue to the trial court for a determination of the applicability of the statute to this inverse condemnation action.

*Watson v. City of Atlanta,* supra at 707 (2).

It is apparent that the applicability of 49 USC § 47506 in this case is a mixed question of law and fact. The legal question is whether or not the federal statute serves to preempt the Landowners' state inverse condemnation remedy and is, therefore, legally applicable in this case. See *Owen v. City of Atlanta,* 157 Ga. App. 354 (277 SE2d 338) (1981), aff'd, 248 Ga. 299 (282 SE2d 906) (1981). If the federal statute does preempt the Landowners' state inverse condemnation remedy, the factual question is whether the criteria for a recovery specified therein have been satisfied by the Landowners in this case. The federal statute does not expressly preempt state legal remedies and, even if state legal remedies are implicitly preempted, the federal statute merely limits claims to cases wherein certain specified criteria are satisfied. Thus, in order for the City to be afforded immunity, the federal statute must implicitly preempt the Landowners' state inverse condemnation remedy as a matter of law *and,* as a matter of fact, the Landowners must have failed to satisfy the criteria specified for a recovery under the federal statute. Whether the Landowners' state inverse condemnation remedy has been implicitly preempted as a matter of law is dependent upon the statutory construction given the federal statute by the courts. *Freightliner Corp. v. Myrick,* ___ U. S. ___ (115 SC 1483, 131 LE2d 385) (1995); *Owen v. City of Atlanta,* supra. Any factual conflict in the evidence as to whether the criteria specified for a recovery under the federal statute have been satisfied by Landowners can be resolved only by the trier of fact.

The applicability of 49 USC § 47506 initially was addressed in connection with the City's motion for summary judgment. The City urged that, as a matter of law, the federal statute implicitly preempted the Landowners' inverse condemnation claim and that, as a matter of fact, the Landowners failed to satisfy the criteria for a recovery specified under the federal statute. In opposition, the Landowners urged that the federal statute did not implicitly preempt their inverse condemnation claim and that, as a matter of fact, they had satisfied the criteria for a recovery specified under the federal statute. The trial court denied the City's motion, holding that "issues of fact" remained as to the applicability of 49 USC § 47506 in this case. Contrary to the Court of Appeals, this certainly was a dispositive interlocutory ruling by the trial court. The trial court's stated reason for the denial of the City's motion for summary judgment was a clear rejection of the Landowners' contention that, as a matter of

law, the federal statute did not afford the City immunity for their inverse condemnation claim and was also a clear rejection of the City's contention that no genuine issue of material fact remained that the criteria specified for a recovery thereunder had not been satisfied by Landowners.

However, as the majority correctly recognizes, the denial of the City's motion for summary judgment ultimately is irrelevant, since that ruling is not subject to appellate review in this case. After the denial of the motion for summary judgment, there was a jury trial and the applicable ruling presented for review is the trial court's giving of a jury charge on 49 USC § 47506. " 'After verdict and judgment, it is too late to review a judgment denying a summary judgment, for that judgment becomes moot when the court reviews the evidence upon the trial of the case.' [Cit.]" *Talmadge v. Talmadge*, 241 Ga. 609 (1) (247 SE2d 61) (1978). Under OCGA § 5-5-24 (b), the time for determining the applicability of jury charges is prior to argument, not at an earlier hearing on a motion for summary judgment. Contrary to the Court of Appeals' ruling, the trial court clearly "resolved" the question of the applicability of the federal statute in this case. It is clear that, by electing to give the charge on 49 USC § 47506, the trial court "resolved" to adhere to its initial interlocutory holding that, contrary to the Landowners' assertion, the federal statute was legally applicable in the case as a matter of law and that, contrary to the City's assertion, there was sufficient evidence to authorize a jury to find that the criteria specified for a recovery thereunder had been satisfied.

As would be true with the giving of any other jury charge, the applicability of the charge on the federal statute was readily determinable by the Court of Appeals based upon the record before it. The issue of whether 49 USC § 47506 was or was not legally applicable as a federal preemption of state legal remedies was simply a matter of statutory construction. If the federal statute was legally applicable in the case, the issue of whether it was factually applicable so as to preempt the Landowners' inverse condemnation claim could be resolved by reviewing the transcript of the jury trial for evidence that the criteria specified therein had been satisfied. The review by the Court of Appeals of the jury charge on the federal statute would be conditioned only upon the existence of record of timely objections during the trial to the legal and factual applicability of the charge. Accordingly, the remand by the Court of Appeals for a determination by the trial court of the applicability of 49 USC § 47506 in this inverse condemnation case was erroneous and superfluous. Instead, the Court of Appeals should have addressed on the merits whatever timely objections were raised in the trial court to the giving of the jury charge on that federal statute.

Rather than remand to the Court of Appeals for that court to address on the merits the timely objections raised by the Landowners to the giving of the jury charge on the federal statute, the majority itself undertakes to determine the "applicability" of that charge in this case. With regard to the legal applicability of the charge, the majority concludes that the federal statute preempts the Landowners' state inverse condemnation remedy and cites *Adams v. City of Atlanta*, 253 Ga. 581 (322 SE2d 730) (1984) in footnote 20 as partial support for that holding. I cannot agree that *Adams* is support for the proposition that 49 USC § 47506 preempts the Landowners' state inverse condemnation remedy. That case is authority only for the proposition that federal law and regulations "preempt *local control* of airspace management, air traffic control, and aircraft noise and emissions. *City of Atlanta v. Owen*, 248 Ga. 299, [supra]; *Owen v. City of Atlanta*, 157 Ga. App. 354, [supra]; [cits.]." (Emphasis supplied.) *Adams v. City of Atlanta*, supra at 581 (1). It does not necessarily follow from a limited federal preemption of local control over airport operations that all state legal remedies for damages suffered as the result of airport operations are thereby preempted. Federal preemption of airport control and immunity from state liability for airport operations are not synonymous legal concepts. *Owen v. City of Atlanta*, 157 Ga. App., supra at 356.

> "[T]he fact that the location and altitude of landing operations is subject to Federal control does not in any manner determine whether the rights of a surface owner have been violated by such flights. . . . The layout of the field may be entirely proper from the standpoint of air safety and air traffic regulations, and may still constitute a nuisance as to a property owner contiguous thereto. . . ." [Cit.]

*Owen v. City of Atlanta*, 157 Ga. App., supra at 357. Nevertheless, an implicit preemption of state law by federal law does result "either when the scope of a statute indicates that Congress intended a federal law to occupy a field exclusively, [cit.], or when state law is in actual conflict with federal law." *Freightliner Corp. v. Myrick*, 115 SC, supra at 1487 (IV). Because *Adams* is not controlling, the issue of whether the Aviation Safety Noise Abatement Act of 1979, of which 49 USC § 47506 is a part, implicitly preempts a state inverse condemnation claim is one of first impression in this state. However, it is clear that the federal statute does implicitly preempt the Landowners' state inverse condemnation claim to the extent that the viability of their claim is dependent upon their satisfaction of the criteria specified for a recovery thereunder. 49 USC § 47506 is couched in terms which limit a recovery of damages attributable to airport noise

to only those who can meet the specified criteria. Compare *Owen v. City of Atlanta*, supra. Moreover, nothing in the federal statute indicates that its intent is not to abridge or alter the existing remedies for airport noise. Compare *Owen v. City of Atlanta*, supra. The federal statute does not eliminate the state inverse condemnation remedy, but it does limit that remedy to those landowners who can demonstrate satisfaction of the specified criteria. Accordingly, I concur in the majority's conclusion that the charge 49 USC § 47506 was legally applicable in this case.

Insofar as the factual applicability of the charge is concerned, there was sufficient evidence to support a finding that the Landowners had actual or constructive knowledge of the existence of the noise exposure map and that they did not satisfy the specified criteria for a recovery of damages for noise attributable to the City's airport. Therefore, the trial court properly overruled the Landowners' timely objection to that charge.

Because 49 USC § 47507 was legally and factually applicable in this case, the trial court correctly gave a charge on that statute and I concur in the reversal of the Court of Appeals' remand of this case to the trial court.

DECIDED SEPTEMBER 23, 1996 —
RECONSIDERATION DENIED OCTOBER 17, 1996.

*Clifford E. Hardwick IV, Charles G. Hicks,* for appellant.
*Chamberlain, Hrdlicka, White, Williams & Martin, Richard N. Hubert, David P. Thatcher,* for appellees.
*Hall, Bloch, Garland & Meyer, F. Kennedy Hall,* amicus curiae.