## S99A0509. LOVE v. THE STATE.
### (517 SE2d 53)

BENHAM, Chief Justice.

Appellant Everette Bryan Love was stopped on I-85 in Gwinnett County for speeding at 11:30 p.m. on May 31, 1996. After approaching appellant's stopped vehicle, the officer arrested appellant for driving under the influence based on the odor of marijuana emanating from appellant's car. Samples of appellant's blood and urine were taken and sent to the Crime Lab· for analysis which revealed the presence of marijuana metabolites in appellant's blood and urine. Appellant was charged with driving under the influence of drugs to the extent he was a less safe driver (OCGA § 40-6-391 (a) (2)), and driving with marijuana in his blood or urine. OCGA § 40-6-391 (a) (6).[1] The trial court denied appellant's motion to quash which was based, in part, on the assertion that OCGA § 40-6-391 (a) (6) was unconstitutional. Appellant was convicted of driving with unlawful drugs present in his blood or urine, but the jury was unable to reach

---

[1] OCGA § 40-6-391 (a) (6) states that "[a] person shall not drive or be in actual physical control of any motor vehicle while . . . there is any amount of marijuana or a controlled substance . . . present in the person's blood or urine, or both, including the metabolites and derivatives of each or both . . .," subject to the provisions of subsection (b) of OCGA § 40-6-391. Subsection (b) provides that a person legally entitled to use a drug is not in violation of the Code section "unless such person is rendered incapable of driving safely as a result of using a drug other than alcohol which such person is legally entitled to use." Subsection (a) (6) was formerly subsection (a) (5). In a 1996 amendment to OCGA § 40-6-391, subsection (a) (4) was added, and subsection (a) (5) was redesignated (a) (6). Ga. L. 1996, p. 1413, § 1.

a verdict on the charge that appellant was driving under the influence of drugs to the extent it made him a less safe driver. On appeal, appellant renews his attacks on the constitutionality of the statute and sees error in the trial court's denial of his motion to suppress the result of the tests on his blood and urine specimens.

1. Appellant contends the trial court erroneously failed to suppress the results of the tests conducted on his blood and urine because the testing methods had not been approved under the Administrative Procedure Act (APA), OCGA § 50-13-1 et seq., and therefore were not "performed according to methods approved by the Division of Forensic Sciences of the Georgia Bureau of Investigation," as required by OCGA § 40-6-392 (a) (1) (A). During its 1997 legislative session, the Georgia General Assembly passed the Forensic Sciences Act, which made the APA inapplicable to the methods of evidence-testing adopted by the GBI's Division of Forensic Sciences. OCGA § 35-3-155. Appellant asserts that the 1997 legislation cannot be applied to his 1996 test results, and asserts that we should overrule the appellate holding in *Helmeci v. State*, 230 Ga. App. 866 (498 SE2d 326) (1998), which authorized the retroactive application of the 1997 legislation.[2]

While OCGA § 35-3-155 was passed after the commission of the offense for which appellant was tried, it did not inflict a greater punishment than was permitted by the law in effect at the time of the offense; it did not make criminal an act which was innocent when done; it did not change the quality or degree of appellant's offense; it did not require less or different evidence than required at the time of the offense; and it did not deprive appellant of any substantial right or immunity he possessed at the time of the offense. See *Todd v. State*, 228 Ga. 746, 751-752 (187 SE2d 831) (1972). The statute did " 'nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed.' [Cit.]" Id. at 751. Accordingly, OCGA § 35-3-155 does not violate ex post facto constitutional provisions and is applicable to the case at bar. *Price v. State*, 269 Ga. 222 (4) (498 SE2d 262) (1998). See also *State v. Martin*, 266 Ga. 244 (3) (466 SE2d 216) (1996). The failure to suppress the test results was not error.

2. Appellant contends that OCGA § 40-6-391 (a) (6) violates the Equal Protection Clause of both the U. S. and Georgia Constitutions

---

[2] Appellant also contends the Forensic Sciences Act authorizes an agency of the executive branch of government to make law and thereby violates the principle of separation of powers found in Art. I, Sec. II, Par. III of the Georgia Constitution. Since no such constitutional attack was raised and ruled upon in the trial court, we decline to address the issue. *Bohannon v. State*, 269 Ga. 130 (497 SE2d 552) (1998).

because the statute singles out for punishment unimpaired drivers with low levels of marijuana metabolites in their body fluids, despite the fact that these drivers pose no threat to traffic safety, the purpose of the DUI statute. Appellant contends that there is no rational basis for treating unimpaired drivers with marijuana metabolites differently from other unimpaired drivers.

A statute attacked as unconstitutional is presumed by the judiciary to be constitutional (*State v. Brannan*, 267 Ga. 315, 317 (477 SE2d 575) (1996)) until it is established that the statute "manifestly infringes upon a constitutional provision or violates the rights of the people. . . ." *Miller v. State*, 266 Ga. 850 (2) (472 SE2d 74) (1996). An equal protection challenge is assessed under the "rational relationship" test when neither a suspect class nor a fundamental right is affected by the challenged statute. *Barnett v. State*, 270 Ga. 472 (510 SE2d 527) (1999). Since neither the right to drive nor the ingestion of marijuana is a fundamental right and appellant's status as one with a low level of metabolites in his bodily fluids is not a suspect class, the legislative classification created by subsection (a) (6) can withstand constitutional assault " 'when the classification is based on rational distinctions and bears a direct and real relation to the legitimate object or purpose of the legislation.' [Cit.]" *City of Atlanta v. Watson*, 267 Ga. 185 (1) (475 SE2d 896) (1996).

Before delving into whether there exists the rational relationship between the statute at issue and a legitimate state interest, we must first note that OCGA § 40-6-391 (a) (6) does not operate to classify a driver as unlawfully impaired. Impaired driving ability is not an element of driving with unlawful drugs in one's body fluids. *Stevenson v. State*, 264 Ga. 892 (2) (453 SE2d 18) (1995). See also *Kevinezz v. State*, 265 Ga. 78 (2) (454 SE2d 441) (1995). Instead, subsection (a) (6) "criminalizes a specific act: driving or being in control of a moving vehicle while there is any amount of marijuana or controlled substance in a person's blood or urine." *Stevenson v. State*, supra, 264 Ga. 892 (2). Whether a driver with metabolites of marijuana in his body fluids was an impaired driver is not an issue when he is prosecuted under subsection (a) (6).[3] The constitutional issue appellant presents is whether a statute which criminalizes the act of driving when the driver's body fluids contain marijuana metabolites bears a rational relationship to a legitimate state interest.

Two experts, a forensic toxicologist from the Georgia Bureau of Investigation's Division of Forensic Sciences and a toxicologist/professor at Mercer University's School of Pharmacy, testified at a pre-

---

[3] Impairment becomes an issue when the defendant asserts that the marijuana metabolites in his body fluids are the result of using medically-prescribed marijuana. See OCGA § 40-6-391 (b).

trial hearing, and the GBI expert testified at trial.[4] From the experts' testimony, we learn the following general information: metabolites of marijuana can be found in the blood of one who smoked marijuana for a couple of days after the marijuana usage, and are detectable in the urine for two weeks to a month after usage. Marijuana smoke inhaled by one not smoking marijuana ("second-hand smoke") can result in detectable amounts of marijuana metabolites in the inhaler's blood and urine if the inhalation occurred in a smoke-filled, small, crowded space. The tests performed by the GBI on blood and urine specimens — Cloned Enzyme Donor Eminase (CEDIA) and Fluorescence Polarization Eminase (FPIA) — result in a "positive" reading for the presence of marijuana metabolites in the body fluid tested if the metabolites' content is at least 100 nanograms per milliliter in urine-testing, and 25 nanograms per milliliter in blood-testing.[5] The GBI's Division of Forensic Sciences set these minimum levels in order to exclude the possibility of a positive result from passive inhalation of second-hand marijuana smoke, or from marijuana usage which occurred several weeks before testing. According to the GBI expert, a finding of the minimum level for urine-testing indicates, for most people, marijuana use within the one-half to two days preceding the time the urine specimen was provided. The blood specimen of an infrequent marijuana user (one time per week) will contain the minimum level for a day, and a positive result on both urine and blood specimens indicates recent marijuana use.

Both experts testified that human beings vary in their sensitivity to marijuana. The Mercer professor testified that the "period of intoxication" varies from person to person and the effects of the drug gradually decline over a period of time, with the effects being gone in 24 hours in almost every case. The expert was unable to make a general statement about how long the drug would affect a specific person's driving ability, but the residual effects on an inexperienced marijuana user could affect driving ability. The GBI expert testified that the loss of manual dexterity which results from marijuana usage can last up to 24 hours.

Based on the experts' testimony and the GBI's minimum evidentiary standard, we conclude that a statute which makes it unlawful to drive while marijuana residue is circulating in the driver's body fluids bears a rational relationship to a legitimate state purpose — protection of the public. Through the enactment of a per se prohibi-

---

[4] We echo the trial court's expression of appreciation to the parties for providing such articulate and understandable experts.

[5] Each of the two tests was performed on appellant's blood sample and his urine specimen. All four test results were positive for marijuana metabolites. Based on the findings, the GBI expert opined that appellant had smoked marijuana sometime the day of his arrest.

tion against driving after using marijuana, the General Assembly has acted to shield the public from the potential dangers presented by persons who drive while experiencing the effects of marijuana. In effect, the General Assembly has determined that "there is no level of illicit drug use which can be acceptably combined with driving a vehicle; the established potential for lethal consequences is too great." *State v. Phillips*, 178 Ariz. 368 (873 P2d 706, 710) (Ariz. 1994). See also *People v. Fate*, 159 Ill.2d 267 (636 NE2d 549) (1994) (the flat prohibition against driving with any amount of controlled substance in one's system was a valid exercise of the police power since it bore a rational relationship to the interests sought to be protected and the means adopted were a reasonable method to accomplish the objective). By enacting OCGA § 40-6-391 (a) (6), the legislature has made it easier for persons to "understand and accept that they are legally unable to drive if they consume virtually any amount of [marijuana]. . . ." *Barnett v. State*, supra, 270 Ga. 472-473. Accordingly, we conclude that there is no merit to appellant's first equal protection challenge.

3. Appellant next contends that § 40-6-391 (a) (6) violates equal protection "by arbitrarily changing the burden of proof of guilt for 'legal' marijuana users," pointing out that a person legally entitled to use marijuana who is driving with marijuana metabolites in his body fluids may only be convicted of violating § 40-6-391 (a) (6) if "such person is rendered incapable of driving safely as a result of using [the] drug. . . ." OCGA § 40-6-391 (b).[6] Thus, the statute allows a person with metabolites of legally-used marijuana in his body fluids to be convicted of driving with marijuana in his system only if it is established that he was "rendered incapable of driving safely" while a person with metabolites of illegally-used marijuana can be found guilty of driving with marijuana in his system without evidence of impairment. Inasmuch as the expert testimony given in this case stated that the pharmacological effects of legally-used marijuana are no different from the effect of illegally-used marijuana, the statute's disparate treatment of users of legal and illegal marijuana is predicated on the purpose for which the marijuana is used — legal marijuana users are not subject to prosecution for the per se prohibition, while illegal users of marijuana are. Thus, those whose marijuana use is legally sanctioned cannot be convicted merely for having

---

[6] Several foreign countries, most notably the Netherlands, permit marijuana use. In Georgia, OCGA § 43-34-121 (d) authorizes qualified physicians to provide marijuana "to seriously ill persons suffering from the severe side effects of chemotherapy or radiation treatment and to persons suffering from glaucoma who are not responding to conventional treatment," and subsection (e) expresses the legislative intent to facilitate clinical trials and research into therapeutic applications of marijuana for glaucoma and the side effects of chemotherapeutic agents and radiation.

metabolites of marijuana in their body fluids, while those whose marijuana use is not legally sanctioned can be.

Under the rational basis test, a legislative classification does not deny equal protection if the classification bears a direct relation to the purpose of the legislation. *City of Atlanta v. Watson*, supra, 267 Ga. at 187; *Nix v. Long Mtn. Resources*, 262 Ga. 506 (2) (422 SE2d 195) (1992). In light of the rational relationship between the statute and the legitimate state purpose of public safety (see Division 2, supra), and the fact that the effects of legally-used marijuana are indistinguishable from the effects of illegally-used marijuana, we are unable to hold that the legislative distinction between users of legal and illegal marijuana is directly related to the public safety purpose of the legislation on which we expounded in Division 2. Accordingly, we conclude that the distinction is arbitrarily drawn, and the statute is an unconstitutional denial of equal protection.

4. In light of our holding in Division 3, we need not address appellant's contention that OCGA § 40-6-391 (a) (6) violates due process of law.

*Judgment reversed. All the Justices concur, except Sears, J., who concurs in the judgment only as to Division 3.*

DECIDED JUNE 1, 1999 —
RECONSIDERATION DENIED JULY 30, 1999.

*Clark & Towne, David E. Clark, Jessica R. Towne,* for appellant.
*Gerald N. Blaney, Jr., Solicitor, Jeffrey P. Kwiatkowski, Gary S. Vey, Assistant Solicitors,* for appellee.